**WESTVACO, VIRGINIA, FOLDING BOX DIVISION, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 84–1230.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 1984.

Decided July 14, 1986.

A.W. VanderMeer, Jr. (David A. Kadela, Hunton & Williams, Richmond, Va., on brief), for petitioner.

Mendelssohn McLean (Helen Morgan, Wilford W. Johansen, Acting General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel, Washington, D.C., on brief), for respondent.

Before ERVIN and WILKINSON, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

MICHAEL, District Judge:

This matter is before the court on a petition for review and a cross-application for enforcement of an Order of the National Labor Relations Board. The petition for review is filed by Westvaco, Virginia, Folding Box Division [hereinafter "petitioner"], with the cross-application being filed by the National Labor Relations Board [hereinafter "the Board"].

This controversy arose from an Order of the Board affirming the decision of the Regional Director in a unit clarification proceeding. In that proceeding, the Regional Director found that certain utilities technicians should properly be treated as an accretion to an existing bargaining unit of the petitioner.

### I.

For many years, the petitioner has operated three plants in Richmond, Virginia, which manufacture printed folding cartons, engraved by the Rotogravure process. The production and maintenance employees of the petitioner have been represented for a number of years by Local 670 of the Bellwood Printing Pressmen, Assistants and Speciality Works [hereinafter "the Union"]. The collective bargaining agreement is standard in nature, but sets forth with particularity the terms and conditions of employment of those within the existing bargaining unit.

In December, 1981, the petitioner began operations in a recently completed addition known as the Cofer Road Gravure Addition [hereinafter "the Addition"]. The Addition used Rotogravure printing presses, but was equipped with a system to filter out and to recover various solvent vapors. The solvents were added to the ink at the time of printing, and, when dried out, left the ink in a solid condition on the boxes. For both economic and environmental reasons, petitioner concluded that it should undertake a solvent recovery process at the Addition, though the other plants of petitioner did not have such a mechanism.

While the power for the solvent recovery process is drawn from the same steam boilers which power the remainder of the plant, the testimony indicates clearly that the solvent recovery process is independent of the manufacturing process, in the sense that the plant could operate without the solvent recovery process, as is the case with the other three plants of the petitioner. In other words, the ultimate end prod-

uct of the manufacturing operation would not be changed, whether or not there was a solvent recovery process installed.

In order to operate the solvent recovery equipment, petitioner hired four additional personnel, which it classified as "utilities technicians". The work of the utilities technicians involves primarily monitoring, operating, and troubleshooting the solvent recovery process. The Union sought to include by accretion these utilities technicians within the existing bargaining unit of production and maintenance employees.

## II.

As is so often the case in an accretion proceeding, the resolution of the controversy turns strongly on the fact pattern presented. However, the Board has in previous cases laid down some reasonably definite guidelines to determine the propriety of granting an accretion petition.

Our first step is that of determining the standard which should be applied by this court in reviewing the action of the Board. Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) indicates that any findings of fact shall be conclusive "if supported by substantial evidence on the record considered as a whole".[1] The cases decided under that section—and for that matter under many sections of the National Labor Relations Act—indicate that Board determinations involving the discretion of the Board are reviewed for abuses of discretion. This is particularly apt in the matter of bargaining unit accretion decisions. *See Universal Security Instruments, Inc. v. NLRB*, 649 F.2d 247 (4th Cir.1981), *cert. denied* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380. Even so, the Board's discretion is not unfettered. The Seventh Circuit described this "narrowing" of discretion as follows:

> Although broad, the Board's discretion in accretion cases is not without limit. In particular, when the Board adopts a policy to guide it in the exercise of its

discretion, the original very broad discretion is to some extent narrowed, and subsequent decisions must be reasonably consistent with the expressed policy. If the Board chooses to depart from established policy, it must explicitly announce the change and its reasons for the change.

*Consolidated Papers, Inc. v. NLRB*, 670 F.2d 754, 757 (7th Cir.1982) (citations omitted).

The Board has determined that the accretion of employees to an existing bargaining unit can be made "only when the additional employees have little or no separate group identity and thus cannot be considered to be a separate appropriate unit and when the additional employees share an overwhelming community of interest with the preexisting unit to which they are accreted". *Safeway Stores, Inc.*, 256 N.L.R.B. 918 (1981) (footnotes omitted). *See also, Universal Security Instruments, Inc. v. NLRB*, 649 F.2d at 253.

■ Furthermore, the Board has adhered for a number of years to a "policy of not joining technical and non-technical employees in the same unit where the unit placement of the technicals is in issue." "Technical employees" are those employees who perform work of a technical nature, requiring specialized training, to be acquired in colleges or technical schools or through special courses, and involving the use of independent judgment. *Litton Industries of Maryland, Inc.*, 125 N.L.R.B. 722, 725 (1959).

Since *Litton*, the Board has modified its approach in that case, by providing a multi-factor approach to decision-making in the accretion cases. The propriety of accretion is determined as set out in *Universal Security Instruments v. NLRB*, 649 F.2d 247, 253–54 (4th Cir.1981); *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380,

> In making its [accretion] determination the Board must closely analyze the cir-

---

1. In this case, the findings of fact are those of the Regional Director, since it appears conceded from the briefs that the Board itself did not make an independent review of the record in affirming the decision of the Regional Director.

cumstances of the workers to determine whether the new and old employees truly share a "community of interests." To do this several factors are scrutinized. These are: (1) similarity of working conditions; (2) job classification; (3) skills and functions; (4) similarity of products; (5) interchangeability of employees; (6) geographical proximity; (7) centralization of managerial control; (8) functional integration of the business; (9) collective bargaining history.

In a 1974 case, and before the standard of review set forth in *Universal Security Instruments*, the Board has held in *New Orleans Public Service, Inc.*, 215 N.L.R.B. 834 (1974) that employees who performed qualitative tests on power equipment, who found and investigated abnormal voltage conditions, and who undertook to adopt measures to correct those conditions were in fact "technical employees". A further finding in that case was that these employees worked alone, were required to determine the cause of a problem and how it should be corrected, and to take the steps to correct the problem.

While the decision in *New Orleans Public Service, supra,* does not track the elements to be considered as set out in *Universal Security, supra,* the two cases, when read together, provide the needed guidance in applying the law to the facts in this case, though it may be conceded, *arguendo,* that *Universal Security, supra,* as the latest pronouncement on the issue, is the stronger precedent in this area.

While this review is in no way intended to be a comprehensive review of the cases, it is believed that it does set out the boundaries within which the controversy now before the court must be resolved.

### III.

Keeping in mind the definition of "technical employees" and the touchstone "community of interests" standard, a review of the facts adduced below is critical to a resolution of the question before us. It should be noted that the only evidence produced was that of the petitioner. Thus, the reviewing officer, the Board, and this court must necessarily have considered the evidence as it was presented by petitioner.

From the testimony of Mr. John Murphy, the supervising engineer, it is clear that the four utilities technicians were required to have had prior work experience in chemical processes and in various pneumatic and electrical controls, together with proficiency in math and chemistry.[2] In addition, the technicians were put through an extensive and specialized training course lasting approximately four months. The petitioner constructed a scale model solvent recovery plant on which the technicians were required to perform the appropriate functions in operating the solvent recovery process. They were given detailed instruction on the operation and function of each of the items of equipment for which they were responsible. The training was not solely a matter of "hands-on" training; classroom time was devoted to how to perform chemical analyses, to the review and study of the various manuals governing the recovery equipment and the utility equipment, and to their general areas of responsibility. The record is silent as to any identical or similar training period required for the members of the production and maintenance force in the bargaining unit.

There are cases militating against a finding that the utilities technicians here are "technical" employees. Although some facts tend to support a "technical" designation, other facts indicate that the utilities technicians are not sufficiently specialized to warrant technical status. A four-month period of on-the-job training, for example, does not necessarily meet the Board's standard of "specialized training usually acquired in colleges or technical schools or through special courses." *Litton,* 125 N.L.R.B. at 725. In previous decisions, the

**2.** The utilities technicians were not required to have had prior experience in the solvent recovery process.

Board has found training periods of one year of technical school plus two years of experience, *see General Electric Co., Pinellas Peninsula Plant*, 127 N.L.R.B. 919, 921 (1960) (electronic engineering technicians), and two to three months of classes plus two years of on-the-job training, *see New Orleans Public Service, Inc.*, 215 N.L.R.B. 834, 838 (1974) (gas dispatchers), insufficient to meet the "specialized training" requirement. Similarly, the use of some independent judgment in evaluating test deviations does not make an individual a "technical" employee. The "technical" label is particularly inappropriate when evaluations are closely prescribed by manuals and when the employee spends substantial time merely recording measurements. *Id.* at 838–39 n. 12; *see also Folger Coffee Co.*, 250 N.L.R.B. 1, 2 (1980).

Nonetheless, the aggregate weight of the various factors enumerated, *e.g., Universal Security, supra* at p. 1173, tends toward a finding of "technical employee" status for these utilities technicians, including particularly training on a scale model of the solvent recovery plant, a factor not found in any of the cases dealing with this issue. While this resolution of the question is not free from doubt, particularly in light of the Board's policy of requiring a strong affirmative case before labelling a particular job "technical", *See Vapor Corp.*, 242 N.L.R.B., at 776, the decision on this issue is not essential to a resolution of the problem presented in this case, as set out *infra*.

The evidence discloses that the line of authority in relation to the utilities technicians, as it bears on the centralization of management control, *supra* at p. 1173, is direct to the Supervisory Engineer-Solvent Recovery and not related to the line of authority for the production and maintenance workers. The utilities technicians are responsible to John Murphy, the Supervisory Engineer—Solvent Recovery. Mr. Murphy has training and a degree in chemical engineering, and he was responsible for interviewing, hiring, and training the four employees who became the utilities technicians. Mr. Murphy's only supervisory authority is that over the four utilities technicians, and he reports directly to the Plant Engineer, who in turn reports to the Plant Manager. No member of the production and maintenance unit is to be found under the supervision of the engineering department or any of its supervisors. It is clear that the utilities technicians are not in the same line of authority as the members of the production and maintenance unit employees.

The utilities technicians devote the principal portion (approximately 75 to 80 percent) of their time to the solvent recovery operation, with the remainder of their time on work in the boiler room and with the other items of utility equipment for which they have responsibility. So far as the record discloses, the only time that the production and maintenance employees deal with the items of equipment assigned to the utilities technicians is when one of the utilities technicians finds an item for which he is responsible in need of repair. When that happens, the lead maintenance man is advised of the situation, and undertakes the necessary repair, under the direction of the utilities technician.

Turning to the terms of employment, which here embrace the *Universal Security Instruments* factors of similarity of working conditions, job classification, skills and functions, similarity of products, interchangeability of employees, geographical proximity, and functional integration of the business, some major differences are found as between the utilities technicians and the production and maintenance employees covered by the Union contract. The utilities technicians are paid on a monthly salary basis, whereas the production and maintenance employees are paid on an hourly basis. There are significant differences in the employee benefits of the utilities technicians and the production and maintenance employees. For example, the production and maintenance employees are entitled to a vacation of three weeks after eight years of service, whereas the utilities technicians qualify for three weeks vacation after five

years of service. The utilities technicians also participate in a savings and investment plan operated by the petitioner in which they have options to purchase petitioner's stock; production and maintenance workers do not have this eligibility of participation. The pension plan for the utilities technicians is based on salary and length of services, whereas the pension for hourly employees is based on a flat rate. Sickness benefit plans give to the utilities technicians full pay during sick leave, whereas production and maintenance employees have an accident and sickness plan which pays the sick employee at a reduced rate. The utilities technicians, as salaried employees, qualify for a long-range disability program, whereas production and maintenance employees do not have the benefit of such a disability plan. Further, the production and maintenance employees have a flat rate life insurance program, where the utilities technicians employees' life insurance program provides for two times their salary in life insurance. Major medical benefits also differ as between the utilities technicians and the production and maintenance employees. This comparison of the methods of payment and the employee benefits indicates that the utilities technicians are regarded as a different and higher grade employee than the production and maintenance workers.

The utilities technicians annual salary is $25,000 per year, with no provision for overtime. Certain of the production and maintenance employees may approach $25,000 a year, but only after computing in overtime. Of some significance in this consideration of the "congeries of facts" is the fact that the utilities technician is not replaced, when on vacation or sick leave, by a production and maintenance employee. Rather, the supervisory engineer, Mr. John Murphy, assumes the responsibilities of the absent technician.

Certain other, less important, differences between the utilities technicians and the production and maintenance employees also

exist. For instance, the utilities technicians may use any door in the plant when coming to or leaving work, unlike the production and maintenance employees who are required to use a specified door. Utilities technicians may take their break and meal periods anywhere in the plant, while the members of the bargaining unit are required to take their breaks and meal periods in the plant cafeteria.[3] While these differences, in other contexts, might be of minimal or no importance, when added to the differences in terms of employment, fringe benefits, etc., they reinforce the view that the utilities technicians are a separate and distinct group, different in kind and degree from the production and maintenance employees in the bargaining unit.

The Appendix reveals the following relevant details as to the activities of the utilities technicians. First, it should be noted that the solvent recovery area is actually outside the plant, in the Addition. Only the utilities technicians work in the solvent recovery control room, where they use, in addition to the ordinary tools in such a room, the gas chromatograph, a Ph monitor, and a programmable microprocessor controller, all of which are covered by various manuals maintained in the solvent recovery control room and available for the use of the utilities technicians.

The only testimony relating to production and maintenance personnel working in the solvent recovery area is that relating to one maintenance person being responsible for walking through the solvent recovery area, once per shift, to look for anything that might be abnormal. The maintenance electricians are apparently responsible for checking the boiler's operation. They are "mainly responsible for looking at steam pressure, seeing [there is] steam pressure; very, very, elementary type checks." The other occasion when production and maintenance personnel might be in the solvent recovery area is when a breakdown has occurred, and a utilities technician has sum-

---

**3.** The record indicates that the utilities technicians generally take such breaks in the solvent recovery control room—away from the production and maintenance employees.

moned the shift lead maintenance man to come in and make the repairs. This happens approximately once per shift, or once per day.

There are minimal references in the Appendix to the fact that employees in the production and maintenance unit are required to keep and fill out forms, but the record reveals that the forms maintained by the production and maintenance employees are relatively simple, whereas the forms maintained by the utilities technicians, as shown in the Appendix, are quite complex and detailed.

In short, it appears obvious that the utilities technicians and production and maintenance employees do not share the "overwhelming community of interest" required for accretion. *Safeway Stores, Inc.*, 256 N.L.R.B. 918, 918 (1981). Virtually none of the considerations identified as relevant in *Universal Security Instruments*, 649 F.2d at 253–54, and *Sheffield Corp.*, 134 N.L.R.B. at 1103–04, support accretion in this case. The utilities technicians perform unique tasks in a distinct area under separate supervision. They were specially trained for their positions and are not interchangeable with production and maintenance employees. They are paid differently, enjoy different fringe benefits, and have greater freedom in their work environment. Both break-time and job-related interaction between the technicians and production and maintenance employees is limited, and management becomes identical only several levels above these employees.

The last factor set out in *Universal Security*, namely, the collective bargaining history, is not applicable here, since the utilities technicians are new employees and have never been involved in any such bargaining in the past. The collective bargaining history at the plant has never dealt with these utilities technicians.

These differences, as recited *supra*, have been sufficient to bar accretion in the past, *see, e.g., Weatherite Co.*, 261 N.L.R.B. 667, 669–70 (1982); *Intermountain Gas Co.*, 231 N.L.R.B. 130, 131 (1977), and are sufficient to bar accretion in this case.

Further, the attempted accretion of the utilities technicians in this case represents an unexplained departure from the Board's cautious policy toward accretion generally. *See Safeway Stores*, 256 N.L.R.B. at 669–70. When substantial factors militate against accretion, the Board heretofore has refused the accretion petition and permitted a union election. *See, e.g., Weatherite Co.*, 261 N.L.R.B. at 669–70; *Safeway Stores*, 256 N.L.R.B. at 918–20. Refusing accretion in doubtful cases is preferable because it protects the employee's freedom to choose his bargaining representative. *See International Ass'n of Machinists and Aerospace Workers v. N.L.R.B.*, 759 F.2d 1477, 1480 (9th Cir.1985); *Westinghouse*, 506 F.2d at 673; *Safeway Stores*, 256 N.L.R.B. at 918. That right of self-determination deserves protection in this case.

As previously noted, no evidence was offered by the union in the course of the proceedings before the hearing officer. Consequently, the recitation of facts set out herein is taken from the evidence tendered in direct examination and in cross-examination of witnesses proffered by the petitioner.

IV.

This perhaps unduly laborious recitation of the facts derived from the Appendix seems necessary in order to determine whether there was in the narrower sense set out *supra*, at p. 1173, an "abuse of discretion" in finding a sufficient community of interest between the production and maintenance workers and the utilities technicians.

As stated *supra*, the Board has held that accretion to an existing bargaining unit is proper "only when the additional employees have little or no separate group identity and thus cannot be considered to be a separate appropriate unit and when the additional employees share an overwhelming community of interest with the preexisting unit to which they are accreted". *See Safeway Stores, Inc.*, 256 NLRB (1981)

(footnotes omitted). *See also, Universal Security Instruments, Inc. v. NLRB,* 649 F.2d at 253.

Certainly, there is a "community of interest" in the limited sense that the utilities technicians and the production and maintenance employees are paid by the same employer, work in generally the same geographical area, and exert their efforts to serve the interests of their employer. However, consideration of only these factors in determining the necessary "overwhelming community of interest" required for accretion would mean that every employee, from the president to the janitor, would fit into a category deserving of accretion. Certainly, the case law looks to more than these factors in determining the extent of the community of interest. Beyond these named factors, the record reveals no further identity or close similarities of duties, working conditions, working area, status as employees, methods of compensation, or fringe benefits which could justify finding that required "overwhelming community of interest" between the production and maintenance employees and the utilities technicians.

Although the hearing officer concluded that the solvent recovery operation, rather than being a separate and distinct operation, "appears to be a step in the production process ...," it appears unquestioned in the record that the production process itself could continue unabated, without the operation of the solvent recovery process. Economic and environmental considerations dictate the use of the solvent recovery process, but it cannot be regarded as a part of the production process, in the sense that the phrase "production process" is intended to cover the process by which the raw materials are brought in, processed, and the finished product brought out at the other end of the production process.

Not only are the utilities technicians employed in a separate operation from the production process, but, as illustrated in the recitation of facts, the utilities technicians share few interests with the maintenance and production employees. The utilities technicians are employed as salaried employees, with substantially greater fringe benefits than the production and maintenance employees. They are given a status which is obviously different from that of the production and maintenance personnel. Perhaps illustrative of the Board's difficulty in drawing from the record sufficient support for its decision is the recitation in the Board's brief that the utilities technicians "may" take their breaks in the cafeteria; this ignores the testimony in the Appendix to the effect that the utilities technicians practically always take their break in the solvent recovery control room. The fact that they "may" use the cafeteria room indicates again the status differential between the utilities technicians and the production and maintenance employees.

If the *Universal Security* standard is to be the test of propriety of accretion, then in the case at bar it is clear that the utilities technicians should not be brought by accretion into the maintenance and production employees bargaining unit. The utilities technicians have a separate group identity, and the court finds no basis for saying that an overwhelming community of interests between the utilities technicians and the production and maintenance personnel exists in this case.

Again, if the requirements of *Universal Security Instruments, Inc., supra,* at p. 1173, are to be applied, it is apparent that the Board in this case has chosen to depart from the policy established in *Safeway Stores, supra,* at p. 1173, without explicitly announcing the change and its reasons for the change. Such a departure, without explanation, from the rule announced in *Safeway Stores,* as applied in *Universal Security Instruments, Inc.,* is an abuse of discretion, in the narrower sense set out *supra.*

For the reasons set out, the prayer of the petition for review is granted and the cross-application for enforcement of the Order of the Board is denied.

DENIED.