**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**United Food & Commercial Workers, Local 204, AFL–CIO; International Union Of Operating Engineers, Local 465, AFL–CIO, Intervenors,**

v.

**LUNDY PACKING COMPANY, Respondent.**

**No. 95–1364.**

United States Court of Appeals, Fourth Circuit.

Argued Sept. 28, 1995.

Decided Nov. 3, 1995.

**ARGUED:** Jill Ann Griffin, National Labor Relations Board, Washington, DC, for Petitioner. Peter James Ford, Assistant General Counsel, United Food and Commercial Workers International Union, AFL–CIO, Washington, DC, for Intervenors. Thomas A. Farr, Maupin, Taylor, Ellis & Adams, P.A., Raleigh, North Carolina, for Respondent. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Scher, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, National Labor Relations Board, Washington, DC, for Petitioner. Richard F. Griffin, Jr., International Union of Operating Engineers, AFL–CIO, Washington, DC, for Intervenors. Robert A. Valois, Michael C. Lord, William P. Barrett, Maupin, Taylor, Ellis & Adams, P.A., Raleigh, North Carolina, for Respondent.

Before WILKINSON, NIEMEYER, and HAMILTON, Circuit Judges.

Enforcement denied by published opinion. Judge WILKINSON wrote the opinion, in which Judge NIEMEYER and Judge HAMILTON joined.

## OPINION

WILKINSON, Circuit Judge:

The National Labor Relations Board ("Board") seeks enforcement of its bargaining order against Lundy Packing Company, Inc. ("Lundy"). The principal basis for Lundy's refusal to bargain is its contention that the Board improperly excluded certain quality control employees from a production and maintenance bargaining unit. We agree. The Board's bargaining unit determination both contravened its own announced standards and accorded controlling weight to the extent of union organization at Lundy, thereby violating § 9(c)(5) of the National Labor Relations Act. Accordingly, we deny the Board's petition for enforcement.

### I.

Lundy operates a pork products plant in Clinton, North Carolina, which employs approximately 880 workers. On March 23, 1993, the United Food and Commercial Workers Union and the International Union of Operating Engineers filed a petition to jointly represent a group ("unit") of production and maintenance ("P & M") employees at Lundy's Clinton facility. Prior to this attempt, there was no history of bargaining here.

The composition of a bargaining unit is significant. Before a union can be certified as the representative of an employee unit, a majority of the unit's employees must vote for union representation. The predilections of employees are often revealed during early organizational efforts, and the inclusion or exclusion of certain employees may thus determine which party will prevail in a subsequent election. *See 1 The Developing Labor Law,* 378–80, 448 (Patrick Hardin, et al., eds., 3d ed.1992).

Here, Lundy and the Unions disagreed over the unit's composition. Lundy contended that a "wall-to-wall" unit (including all employees) was appropriate. The Unions'

proposal, meanwhile, excluded approximately 213 employees, among them: drivers, waste management operators, garage employees, office clerical employees, process sales coordinators, hog buyers, quality control employees, and industrial engineers. Following a hearing, on May 7, 1993, the Acting Regional Director approved with some additions the Unions' proposal for a less inclusive unit. On appeal, the Board directed that challenged ballots be cast by some of the excluded employees, including the electrician, the receiver, the industrial engineers ("IEs"), and the quality control employees (quality assurance/lab technicians and temporary management trainees ("QA/LTs") and lab technicians ("LTs")).

The election was held on June 3, 1993, with the Unions prevailing on a 318 to 309 vote (absent the 24 challenged and sealed ballots). After an investigation of the challenged ballots, the Regional Director ordered the opening and counting of the nine ballots cast by quality control employees, the three ballots cast by industrial engineers, and the two ballots cast by the waste management operator and receiver. The record does not reveal how the challenged votes might have affected the election outcome.

The Unions appealed this ruling to the Board. On September 2, 1994, the Board in a divided decision reversed the Regional Director, ordering that the challenged ballots for the QA/LTs, LTs, and IEs be disposed of and the Unions certified. Lundy subsequently refused to bargain with the Unions, precipitating an unfair labor charge and this appeal.

### II.

■ Section 9(b) of the National Labor Relations Act grants to the Board the power to determine "the unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). We are mindful that the Board possesses broad discretion in determining the appropriate unit. *Arcadian Shores, Inc. v. NLRB,* 580 F.2d 118, 119 (4th Cir.1978). The Board's discretion reflects both its acknowledged expertise in such matters and its need for " 'flexibility in shaping the [bargain-

ing] unit to the particular case.'" *NLRB v. Action Automotive, Inc.*, 469 U.S. 490, 494, 105 S.Ct. 984, 987, 83 L.Ed.2d 986 (1985), *quoting NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 134, 64 S.Ct. 851, 862, 88 L.Ed. 1170 (1944).

■ Nonetheless, the Board must operate within statutory parameters. Section 9(c)(5) of the National Labor Relations Act states: "In determining whether a unit is appropriate ... the extent to which the employees have organized shall not be controlling." 29 U.S.C. § 159(c)(5). This provision came in response to several Board "decisions where the unit determined could only be supported on the basis of the extent of organization." *Labor Board v. Metropolitan Ins. Co.*, 380 U.S. 438, 441, 85 S.Ct. 1061, 1063, 13 L.Ed.2d 951 (1965). While the operative concept "extent of organization" is not defined in the statute, it refers generally to "the groups of employees on which the union has focused its organizing efforts." 1 *The Developing Labor Law* at 452. Moreover, § 9(c)(5) does not merely preclude the Board from relying "only" on the extent of organization. The statutory language is more restrictive, prohibiting the Board from assigning this factor either exclusive or "controlling" weight. *See Arcadian Shores*, 580 F.2d at 120 (section 9(c)(5) prohibits "the extent of union organization [from being] the *dominant* factor in the Board's determination of the bargaining unit").

Heretofore the Board has generally avoided § 9(c)(5) violations by applying a multi-factor analysis that was sufficiently independent of the extent of union organization—the so-called "community of interest" test. Several criteria, no one of which was more dominant than another, would determine whether employees shared a community of interest sufficient to form an appropriate unit:

(1) similarity in the scale and manner of determining the earnings; (2) similarity in employment benefits, hours of work, and other terms and conditions of employment; (3) similarity in the kind of work performed; (4) similarity in the qualifications, skills, and training of the employees; (5) frequency of contact or interchange among the employees; (6) geographic proximity; (7) continuity or integration of production processes; (8) common supervision and determination of labor-relations policy; (9) relationship to the administrative organization of the employer; (10) history of collective bargaining; (11) desires of the affected employees; (12) extent of union organization.

*I.T.O. Corp. of Baltimore v. NLRB*, 818 F.2d 1108, 1113 (4th Cir.1987), *quoting* R. Gorman, *Labor Law: Unionization and Collective Bargaining* 69 (1976).

Under this traditional method of analysis, the excluded quality control employees at Lundy appear to qualify for inclusion in the appropriate bargaining unit. The QA/LTs performed functions that were integral to the production process. In fact, they spent approximately 80 percent of their time on the production floor where they tested the cleanliness of the facility, obtained temperatures of hogs and products, and otherwise inspected the production line. The remaining 20 percent of their time was consumed in an office recording the results of their testing. The LTs spent about 15 percent of their time taking samples and 85 percent of their time performing tests in a laboratory. All these employees shared a great deal with the production and maintenance employees who were included in the Unions' proposed unit: (1) comparable wages; (2) identical benefits; (3) the performance of tasks essential to the production process; (4) similar educational backgrounds; (5) interaction on the production floor; (6) close physical proximity; (7) the same cafeteria, parking lot, break rooms, and locker room; and (8) similar performance evaluations.

■ The excluded quality control employees did differ in a few respects: (1) the method for calculating their earnings; (2) supervision; and (3) a lack of interchangeability with other P & M positions (other P & M employees did not perform the work of quality control employees in their absence). Such differences, however, were not unique to the quality control employees. At least one P & M employee who was included in the bargaining unit had his pay calculated in the same manner as the excluded quality control employees, and dozens of other employees

with different supervisors were included within the bargaining unit. The exclusion of quality control employees based on such meager differences is, to say the least, problematic under the "community of interest" standard, when such employees were engaged in tasks essential to the company's meat packing and processing operation.[1]

■ The Board, however, adopted a novel legal standard which effectively accomplished the exclusion. Under this new standard, any union-proposed unit is presumed appropriate unless an "overwhelming community of interest" exists between the excluded employees and the union-proposed unit: "Here, [the Board] find[s] ... that the technicians do not share such an overwhelming community of interest with the petitioned-for production and maintenance employees as to mandate their inclusion in the unit despite the Petitioners' objections." *Lundy Packing Co., Inc.,* 314 N.L.R.B. 1042, 1043, 1994 WL 481361 (1994). By presuming the union-proposed unit proper unless there is "an overwhelming community of interest" with excluded employees, the Board effectively accorded controlling weight to the extent of union organization. This is because "the union will propose the unit it has organized." *Laidlaw Waste Systems, Inc. v. NLRB,* 934 F.2d 898, 900 (7th Cir.1991); *see Continental Web Press, Inc. v. NLRB,* 742 F.2d 1087, 1093 (7th Cir.1984) ("the fact that [ ] the union wanted a smaller unit ... could not justify the Board's certifying such a unit if it were otherwise inappropriate"). Given the community of interest between the included and excluded employees here, it is impossible

to escape the conclusion that the QA/LTs' ballots were excluded "in large part because the Petitioners do not seek to represent them." *Lundy Packing,* 314 N.L.R.B. at 1046 (Member Stephens, dissenting). In fact, the Board has as much as admitted that it gave controlling weight to the Unions' proposal: "[A] unit including [quality control] employees might also have been an appropriate unit had such a unit been sought by the Petitioners." *Lundy Packing,* 314 N.L.R.B. at 1044.[2]

The Board's ruling thus exhibits the indicia of a classic § 9(c)(5) violation. The cases offered by the Board to support its holding, *Penn Color, Inc.,* 249 N.L.R.B. 1117, 1980 WL 11466 (1980), and *Beatrice Foods,* 222 N.L.R.B. 883, 1976 WL 7806 (1976), do not adopt or even reference the "overwhelming interest" test. Instead, it appears that the Board imported the "overwhelming interest" test from an entirely different area of labor law, accretion cases. In accretion cases, however, new employees are added to an existing bargaining unit *without* a representation election; therefore, the showing of shared characteristics must be higher to protect employee interests. *See, e.g., Westvaco, Va., Folding Box Div. v. NLRB,* 795 F.2d 1171, 1173 (4th Cir.1986). In accretion cases, the Board has indeed explained that new employees can be added to an existing bargaining unit "only when the additional employees have little or no separate group identity and thus cannot be considered to be a separate appropriate unit and when the additional employees share an *overwhelming*

1. While the industrial engineers ("IEs") were not as numerous, we agree with the dissenting Member, *see Lundy Packing Co., Inc.,* 314 N.L.R.B. 1042, 1046, 1994 WL 481361 (1994) (Member Stephens, dissenting), and the Regional Director that the IEs shared a community of interest with other P & M unit personnel. The IEs studied the efficiency of the production process, spending 50 percent of their time working on the production floor with P & M employees to reduce production costs. The IEs routinely spoke with P & M employees while performing their duties, had the same benefits and holidays, earned comparable wages, occasionally performed the work of other P & M employees, and had to meet no particular educational requirements. Further, there was no evidence that the basis for promotion was any different for IEs than for other P & M employees.

Accordingly, it was error for the Board to exclude them from the P & M unit.

2. While the Board points to the fact that the Acting Regional Director, early in this case, enlarged the unit beyond the Unions' initial request, we find this inapposite because the Unions did not appeal these early classifications to the Board. The sole question before the court is whether the Board gave controlling weight to union organization with regard to the exclusion of the QA/LTs, LTs, and IEs. The Acting Regional Director's determinations regarding *different* employees in no way insulated the Board from subsequent statutory violations when it decided whether an appropriate unit included the QA/LTs, LTs, and IEs.

*community of interest* with the preexisting unit to which they are accreted." *Safeway Stores, Inc.,* 256 N.L.R.B. 918, 1981 WL 20532 (1981) (emphasis added). But this was not an accretion case, and the Board's transposition of the "overwhelming interest" standard runs afoul of § 9(c)(5).

### III.

The statutory infirmity of the Board's holding is underscored when the Board's prior treatment of quality control personnel is examined. Heretofore, in an effort to avoid workplace fragmentation, the Board has consistently included quality control personnel in P & M units. *Bennett Industries, Inc.,* 313 N.L.R.B. 1363, 1364, 1994 WL 673754 (1994) (quality control employees included within P & M unit by Regional Director because they "perform a function which is an extension of and integrated with the manufacturing process and work in close proximity to undisputed unit employees"); *Virginia Mfg. Co., Inc.,* 311 N.L.R.B. 992, 994, 1993 WL 193727 (1993) (quality control employee included within P & M unit because he spent 20 percent of his time on the production floor and had contact with unit employees); *Hogan Mfg., Inc.,* 305 N.L.R.B. 806, 807, 1991 WL 263214 (1991) (quality control employee included within P & M unit because "quality control is a vital part of the production process"); *Blue Grass Industries, Inc.,* 287 N.L.R.B. 274, 299, 1987 WL 90121 (1987) (quality control employees included within P & M unit because they are an "integral part of the overall manufacturing process"); *SCM Corp.,* 270 N.L.R.B. 885, 886, 1984 WL 36459 (1984) (quality control employee included within P & M unit because he receives comparable benefits and has "regular work-related contact with other unit employees"); *Libbey Glass Division,* 211 N.L.R.B. 939, 941, 1974 WL 5114 (1974) (quality control employees included within P & M unit because "it is clear these employees have substantial contact with production and maintenance employees in performing their inspection functions, and their duties are an integral part of the Employer's overall glass manufacturing process"); *Ambrosia Chocolate,* 202 N.L.R.B. 788, 789, 1973 WL 12216 (1973) (quality control employees included within P & M unit because they share the same lunchroom, locker room, parking lot, holidays, and benefits, thereby creating "sufficient common interests").

The Board's rationale thus seemed clear: quality control employees were integrally related to the production process and typically shared important characteristics with other P & M employees. Indeed, P & M unit representation of quality control employees appeared to be routine. The Board had included quality control workers in P & M units under quite divergent circumstances: (1) cases in which the union sought to exclude all quality control personnel, *see, e.g., Ambrosia Chocolate,* 202 N.L.R.B. at 788; (2) cases in which the union sought to include all quality control personnel, *see, e.g., Libbey Glass Division,* 211 N.L.R.B. at 939; and (3) cases in which a party sought to exclude some quality control employees from a unit that represented other quality control personnel, *see, e.g., Virginia Mfg.,* 311 N.L.R.B. at 994. Even the United Food and Commercial Workers International Union, one of the unions objecting to the inclusion of quality control employees here, represents quality control workers at another North Carolina food plant, Equity Group.

The Board can point to only two cases in which quality control employees were excluded from a P & M unit, and both are easily distinguishable. In *Penn Color,* 249 N.L.R.B. at 1120, quality control employees had a different basis for promotion, different educational requirements, and there was no evidence of substantial contact with other P & M employees. Quality control personnel were similarly isolated in *Beatrice Foods,* 222 N.L.R.B. 883, 1976 WL 7806 (1976), where they worked in a laboratory and did not have regular contact with other P & M employees. At Lundy, in contrast, quality control employees often worked on the production floor, shared a similar basis for the evaluation of their work, had regular contact with other P & M employees, and faced no special academic requirements. In short, Lundy's quality control employees were integrated into the production process, while those at Penn Color and Beatrice Foods were not.

Whatever the Board's chosen criteria for decision, they must be applied consistently. "[W]hen the Board adopts a policy to guide it in the exercise of its discretion, the original very broad discretion is to some extent narrowed, and subsequent decisions must be reasonably consistent with the expressed policy." *Westvaco,* 795 F.2d at 1173, *quoting Consolidated Papers, Inc. v. NLRB,* 670 F.2d 754, 757 (7th Cir.1982). Courts have insisted "that the Board apply with reasonable consistency whatever standard it adopts to guide the exercise of its delegated power." *Continental Web Press,* 742 F.2d at 1089. While the Board may choose to "depart from established policy, it must explicitly announce the change and its reasons for the change." *Westvaco,* 795 F.2d at 1173, *quoting Consolidated Papers,* 670 F.2d at 757. In *Continental Web Press,* for example, the Board had deviated from a policy of including certain employees in a bargaining unit without explaining "why a unit that it had again and again found to be homogenous should be broken into subunits." 742 F.2d at 1094.

The court denied enforcement, explaining that while "[t]he Board is allowed to reverse course ... it has got to give reasons, or else the reversal is arbitrary." *Id.* at 1093 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Here, the Board gave insufficient reasons for its change of course and switch of standards.

We recognize that bargaining unit cases are fact-sensitive and that decisional law will seldom travel a straight-line course. Nonetheless, the significance of neutral rationales for inclusion or exclusion of particular employees in collective bargaining units cannot be overstated. Otherwise, reviewing courts will have no means of enforcing § 9(c)(5)'s prohibition; the Board can selectively rely on differences when the union desires exclusion of employees—and on similarities when the union desires inclusion. *See* Joan Flynn, *The Costs and Benefits of "Hiding the Ball": NLRB Policymaking and the Failure of Judicial Review,* 75 B.U.L.Rev. 387 (1995). The deference owed the Board as the primary guardian of the bargaining process is well established. It will not extend, however, to the point where the boundaries of the Act are plainly breached.

## IV.

We do not reach respondent's other assignments of error. For the foregoing reasons, we deny enforcement of the Board's order.

*ENFORCEMENT DENIED.*