UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 97-2719(L)
(9-CA-33304, 9-CA-33478)

Americare Pine Lodge Nursing and Rehabilita-
tion Center,

Petitioner,

versus

National Labor Relations Board,

Respondent.

O R D E R

The court amends its opinion filed January 7, 1999, as follows:

On page 13, footnote 3, line 5 -- the wording is corrected to read "to take <u>any</u> action it deemed appropriate ...."

On page 18, first full paragraph, line 13 -- the word "Futher" is corrected to read "Fu<u>r</u>ther."

On page 18, footnote 7, lines 7 and 8 -- the wording is corrected to read "the 24¢ or the 50¢ increase."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

| | |
|---|---|
| AMERICARE PINE LODGE NURSING AND<br>REHABILITATION CENTER,<br><u>Petitioner,</u><br><br>v.<br><br>NATIONAL LABOR RELATIONS BOARD,<br><u>Respondent.</u> | No. 97-2719 |
| NATIONAL LABOR RELATIONS BOARD,<br><u>Petitioner,</u><br><br>v.<br><br>AMERICARE PINE LODGE NURSING AND<br>REHABILITATION CENTER,<br><u>Respondent.</u> | No. 98-1120 |

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
(9-CA-33304, 9-CA-33478)

Argued: September 23, 1998

Decided: January 7, 1999

Before MURNAGHAN and WILLIAMS, Circuit Judges, and
BULLOCK, Chief United States District Judge from the
Middle District of North Carolina, sitting by designation.

_____

Petition for review granted in part and denied in part, and cross-
application for enforcement granted in part and denied in part by pub-

lished opinion. Judge Williams wrote the opinion, in which Chief Judge Bullock joined. Judge Murnaghan wrote a separate opinion concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Thomas Patrick Dowd, LITTLER, MENDELSON, P.C., Baltimore, Maryland, for Center. Julie Brock Broido, Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Peter Winkler, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Americare Pine Lodge Nursing and Rehabilitation Center (Pine Lodge) petitions for review, and the National Labor Relations Board (the Board) cross-petitions for enforcement, of the Board's order determining that Pine Lodge violated § 8(a)(1) and (a)(5) of the National Labor Relations Act (NLRA or the Act) by engaging in direct dealing with its employees, unlawfully withdrawing recognition from the employees' union as the exclusive bargaining representative, and unilaterally imposing wage increases. See 29 U.S.C.A. § 158(a)(1) & (a)(5) (West 1998). For the reasons stated herein, we grant Pine Lodge's petition for review in part and deny it in part; and we grant the Board's cross-petition for enforcement in part and deny it in part.

I.

This case arises from events surrounding Pine Lodge's July 1995 attempt to secure an extended labor agreement approximately five

2

months before the expiration of the agreement then in effect.**1** The employees were represented by The Healthcare and Social Union, SEIU, AFL-CIO (the Union) and successfully had negotiated a labor agreement covering the period from December 9, 1993, to December 7, 1995 (the 1993 agreement). That agreement did not have a reopener clause, but did allow for written amendments with the consent of both parties.

Because Pine Lodge was planning to open a new subacute care unit in December 1995, it wished to avoid labor negotiations during that period. It therefore forwarded a letter to the Union on July 5, 1995, offering to extend the 1993 agreement for one year. In return for the extension, Pine Lodge offered a $.25 or $.50 per hour wage increase, dependent upon job classification, to the represented employees. The offer was set to expire by its own terms on July 17, 1995. Pine Lodge faxed the July 5, 1995, offer letter to the Union. Soon afterwards, that same offer letter was posted near the Pine Lodge employee time clock so that the employees could read it.

The Union representative charged with responsibility for Pine Lodge's bargaining unit, Jennifer Jordan, was away on vacation when the offer was received at the Union offices. Upon her return on July 11, she received the offer letter and several messages from Pine Lodge employees concerning the outstanding offer. She visited with employees about the offer on July 14, three days before it was set to expire. Based on her discussions, Ms. Jordan decided that the employees did not favor the offer and instead preferred to negotiate other matters such as grievance procedures and fringe benefits at a date closer to the expiration of the 1993 agreement. A few employees also asked Jordan about anniversary wage increases, a provision that was included in the 1993 agreement. The Union chose not to make a counter-proposal and simply allowed the offer to expire.

While the offer was outstanding, however, two conversations concerning the proposal occurred between Pine Lodge supervisors and

_____

**1** Pine Lodge disputes several of the Board's specific findings and we address those contentions in Part III. The facts as set forth in Part I are taken largely from the administrative law judge's (ALJ) decision as adopted by the Board.

3

employees. The first occurred between Dietary Manager Dreama Thomas and four employees. Thomas held a meeting at which Brenda Elliott, one of her employees, raised a question concerning the status of anniversary wage increases under the new proposal. Because Thomas was not familiar with the details of the proposal, she requested Office Manager Jackie Clark to join the meeting and respond to the question. Clark also was unable to explain how the anniversary wage increases were to be treated under the new proposal. After a short discussion, the meeting ended without any resolution.

Dreama Thomas also was involved in a second conversation regarding the proposal, this time with an employee named Dorothy Smith. During a smoking break in Smith's car, Thomas asked Smith her opinion of Pine Lodge's proposal. Smith responded that it sounded good, but that it was made simply to get rid of the Union. Thomas made no response and their discussion of the proposal ended.

Despite the expiration of the July 5 proposal, Pine Lodge submitted another proposal to the Union on July 28, 1995. This proposal mirrored the first, but specifically noted that anniversary wage increases would be maintained in addition to the newly offered hourly raises. The July 28 offer letter also stated:

> If you really care about the hard working employees at Americare-Pine Lodge, then you will give them an opportunity to have a secret ballot vote on whether or not to accept this large and very generous wage increase. I honestly believe this proposal is much more than we will be offering if we have to bargain in December 1995.

(J.A. at 304.) Pine Lodge also copied the July 28 offer letter to its employees.

Along with the July 28 letter, Sherry Johnson, the Administrator at Pine Lodge, authored and distributed a memorandum to the Pine Lodge employees. The memorandum read as follows:

> I have had many employees come to me asking if the wage increase that was offered earlier could be extended or

4

reoffered since the union did not respond to the previous offer.

I am pleased to announce that the company has agreed to reoffer this proposal. Also, please note for the employees who were concerned about not getting an anniversary increase, that this is being offered also.

I feel that this is an extremely fair offer for each of you. I urge you to giving [sic] this proposal serious thought.

I will be holding meetings next week to discuss this more indepth [sic] for those who have questions.

Please note in the attached correspondence that the union must respond to Steve Ronilo, our human resource vice president by 6:00 p.m. on Friday, August 4, 1995, if you want this wage increase.

Thank you for your time and attention to this proposal.

(J.A. at 306.)

On July 31, after receiving the second offer letter, Jennifer Jordan again met with Pine Lodge employees and distributed a flyer notifying them that the Union intended to hold a membership meeting on August 4, at which it would take a vote on the second offer. Between July 31 and August 4, the Union and Pine Lodge actively campaigned for their positions. Both sides distributed flyers encouraging the employees to vote for or against the proposal.[2] Sherry Johnson and

_____

**2** A typical Pine Lodge flyer read as follows:

There are no guarantees in life or in negotiations .. .
. . .

Except the raise Pine Lodge is offering now! ! !

25 cents and 50 cents per hour increase!

You deserve a raise, so why not give yourself one effective July 1, 1995

another supervisor, Nancy Cooper, also approached a few employees individually and discussed the offer with them personally, once the Union announced the decision to hold a vote. Finally, during that same period, members of Pine Lodge management held a meeting for nursing assistants and encouraged them to vote in favor of the proposal.

At the August 4 Union meeting, the employees soundly rejected the offer, but only 28 of the 73 bargaining unit employees voted. On August 7, Sherry Johnson issued a memorandum announcing that the wage increase would not be implemented.

Between August 25 and September 7, employees submitted signed copies of a petition to Pine Lodge's management expressing their desire to remove the Union as their exclusive bargaining representative. A majority, thirty-nine of the bargaining unit's seventy-three employees, signed the petition. Based on the petition, Steve Ronilo, the Vice President of Human Resources for Pine Lodge's parent company, sent a letter to the Union dated September 8 stating that Pine Lodge was in possession of objective evidence that the Union no longer represented a majority of employees, and that Pine Lodge was, therefore, withdrawing recognition from the Union upon the expira-

_____

(J.A. at 312.)

A typical Union flyer read as follows:

> Boss offers bargaining unit .25 & .50 instead of negotiations
>
> A boss that fights the Union every step of the way now wants to offer us wages instead of negotiations
>
> What's Up!!
>
> Come and Find Out
>
> Full membership meeting & vote on proposal
> Friday August 4th
> 10:30am, 1:00pm, 3:30pm
> Honey in the Rock Motel

(J.A. at 307.)

6

tion of the 1993 agreement. True to its word, Pine Lodge withdrew recognition from the Union on December 7, 1995, and unilaterally implemented the previously offered wage increase the following day.

Based on charges lodged by the Union, the Board issued a complaint against Pine Lodge accusing it of engaging in unfair labor practices. Specifically, the complaint charged that Pine Lodge circumvented the Union and dealt directly with the employees, improperly withdrew recognition from the Union, and unilaterally increased wages without engaging in mandatory bargaining. After a hearing was conducted, an administrative law judge (ALJ) concluded that Pine Lodge engaged in unfair labor practices in violation of § 8(a)(1) and (a)(5) of the NLRA. The ALJ specifically found that Pine Lodge impermissibly dealt directly with employees. Consequently, the ALJ determined that the employee's decertification petition was tainted and that Pine Lodge inappropriately relied upon it to withdraw recognition from the Union and unilaterally to grant wage increases to the employees.

The Board agreed with the ALJ's conclusions and, with only slight modification, adopted the ALJ's order on November 8, 1997. The order required Pine Lodge to: inform employees of the Board-determined violations; recognize and bargain with the Union; cease any direct bargaining with employees; discontinue interfering with the exercise of rights under § 7 of the Act; post a notice informing employees of their rights and pledging not to interfere with those rights; and submit an explanation to the Board of how Pine Lodge was to implement the order.

Pine Lodge petitioned this Court for review of the Board's decision and order. The Board cross-petitioned for enforcement of its November 8, 1997, order. Because we conclude that the Board correctly determined that Pine Lodge engaged in a single episode of direct dealing, but the Board erred in holding that Pine Lodge committed other unfair labor practices in violation of § 8(a)(1) and (a)(5) of the Act, we grant Pine Lodge's petition for review in part and deny it in part, and we grant the Board's cross-petition for enforcement in part and deny it in part.

7

II.

In reviewing the Board's decision, the applicable standard of review varies according to the aspect of the decision specifically at issue. The Board maintains some discretion in its interpretation of the NLRA and courts grant deference to that interpretation. See Holly Farms Corp. v. NLRB, 116 S. Ct. 1396, 1406 (1996); Pirelli Cable Corp. v. NLRB, 141 F.3d 503, 514 (4th Cir. 1998). A court will not defer to the Board's interpretation of the NLRA, however, unless "its reading is a reasonable one." Holly Farms, 116 S. Ct. at 1406 ("For the Board to prevail, it need not show that its construction is the best way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one."). In cases involving the Board's exercise of discretion, we review for an abuse of discretion. See Westvaco v. NLRB, 795 F.2d 1171, 1173 (4th Cir. 1986). We consider a departure from established policy, absent a reasonable explanation, to be an abuse of discretion. See id.

In mixed questions of law and fact, or of pure fact, courts will consider the Board's findings to be conclusive if the factual findings are supported by substantial evidence based upon the record as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 491 (1951); 29 U.S.C.A. § 160(e) (West 1998) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."); Pirelli, 141 F.3d at 514. Substantial evidence is defined as evidence that is sufficient to support the conclusion of a reasonable person. See Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619-20 (1966); Pirelli, 141 F.3d at 514.

In this case there are two overriding questions: First, did Pine Lodge's management engage in unfair labor practices, and second, did any unfair labor practices sufficiently taint the decertification petition as to make it unreliable? Only if the petition was tainted, was the later withdrawal of Union recognition and the unilateral grant of wage increases improper.

III.

Whether Pine Lodge engaged in unfair labor practices during the course of its attempt to extend the contract is the first and most impor-

8

tant question we must answer because it is potentially dispositive of the remaining issues. Although several factual scenarios allegedly support the Board's conclusion that Pine Lodge engaged in unfair labor practices, the foundation for all of the charges is the premise that Pine Lodge engaged in a pattern of direct dealing with its employees, thus circumventing the Union. To determine whether the Board's holdings were accurate, we must first explore the law regarding direct dealing, giving due deference to the Board's interpretation.

Direct dealing is a term used to describe practices that constitute violations of § 8(a)(1) and (a)(5) of the Act. See 29 U.S.C.A. § 158(a)(1) & (a)(5) (West 1998). Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C.A. §§ 158(a)(5), 159(a) (West 1998). Section 8(a)(1) makes it illegal "to interfere with, restrain, or coerce employees" in the exercise of their right to organize and bargain collectively. 29 U.S.C.A. §§ 157, 158(a)(1) (West 1998). These provisions require an employer to bargain exclusively with the union representative and prohibit an employer from unduly interfering in union organizing and collective bargaining.

The Board and the courts unanimously have recognized that an employer violates § 8(a)(1) and (a)(5) if it engages in direct dealing with employees and thereby interferes in the collective bargaining process and in the union's role as the exclusive bargaining representative. See, e.g., Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 683-84 (1944); NLRB v. Pratt & Whitney Air Craft Div., 789 F.2d 121, 134-35 (2d Cir. 1986); United Techs. Corp. 274 N.L.R.B. 609, 609 (1985), enforced sub nom. NLRB v. Pratt & Whitney Air Craft Div., 789 F.2d 121 (2d Cir. 1986). Improper direct dealing is characterized by actions that persuade employees to believe that they can achieve their objectives directly through the employer and thus erode the union's position as the exclusive bargaining representative. See Pratt & Whitney, 789 F.2d at 134. Another way to frame the question of direct dealing is "whether the employer has chosen `to deal with the Union through the employees, rather than with the employees through the Union.'" Id. (quoting NLRB v. General Elec. Co., 418 F.2d 736, 759 (2d Cir. 1969)).

Counterbalancing the prohibition against direct dealing is an employer's strong interest in preserving its right to free speech. Con-

9

gress expressly recognized an employer's First Amendment right by enacting 29 U.S.C.A. § 158(c), which states:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C.A. § 158(c) (West 1998). An employer is, therefore, free to communicate its views "so long as the communications do not contain a threat of reprisal or force or promise of benefit." NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969). As the Board has recognized, "permitting the fullest freedom of expression by each party" nurtures a healthy and stable bargaining process. United Techs., 274 N.L.R.B. at 610.

Drawing the line between an employer's freedom to speak and direct dealing produces a relatively straightforward standard of permissible conduct. An employer may speak freely to its employees about a wide range of issues including the status of negotiations, outstanding offers, its position, the reasons for its position, and objectively supportable, reasonable beliefs concerning future events. See, e.g., Gissel Packing, 395 U.S. at 618; Pirelli, 141 F.3d at 516; Facet Enters. v. NLRB, 907 F.2d 963, 969 (10th Cir. 1990); Pratt & Whitney, 789 F.2d at 134. But, under § 8(c) the employer cannot act in a coercive manner by making separate promises of benefits or threatening employees. Thus the employer may freely communicate with employees in noncoercive terms, as long as those communications do not contain some sort of express or implied quid pro quo offer that is not before the union. See, e.g., Selkirk Metalbestos v. NLRB, 116 F.3d 782, 788 (5th Cir. 1997) (noting that the promise of benefit need be only reasonably inferable from the conduct); NLRB v. Garry Mfg. Co., 630 F.2d 934, 943 (3d Cir. 1980) ("It is firmly established that an employer violates section 8(a)(1) by his solicitation of grievances, if accompanied by an express or implied promise to remedy the grievance . . . ."). This standard recognizes the right of represented employees to negotiate exclusively through the union, while protecting the right of employers to tell their side of the story.

10

With these general standards in mind, we turn to the events that the Board characterized as direct dealing.

A.

On July 5 and July 28, 1995, Pine Lodge sent letters offering a contract extension in return for wage increases to the Union's business offices and copied the letters to Pine Lodge employees. These letters specifically offered hourly wage increases to all bargaining unit employees in return for a one-year extension of the Union contract. The July 28 letter also strongly encouraged the Union to hold a secret-ballot vote on the proposal. In his decision, affirmed by the Board, the ALJ recognized that an employer may communicate the reasoning supporting its bargaining position but concluded that posting the offer letters constituted unlawful direct dealing because the Union had no meaningful opportunity to consider the proposal. Whether the Union must have such an opportunity is a question of law, and, accordingly, if the Board's interpretation of the NLRA is reasonable, then it is entitled to deference. See Holly Farms, 116 S. Ct. at 1406.

Based on a review of the NLRA and previous Board and judicial interpretations of its provisions, we find no support for a rule requiring employers to delay informing its employees of a proposal until the union has had some period of time to consider it. Communications to employees that inform them of the employer's bargaining position constitute no violation. See Facet Enters., 907 F.2d at 968-69; General Elec. Co., 418 F.2d at 756; United Techs., 274 N.L.R.B. at 609-10; Adolph Coors Co., 235 N.L.R.B. 271, 277 (1978). In United Technologies, the Board found no violation when an employer passed out leaflets to employees explaining its final offers to the union made on that same day and also telling employees that they could consider the offers only if the union presented them. See United Techs., 274 N.L.R.B. at 609-10. In KEZI, Inc., the Board found no violation even when an employer made public a benefit proposal directly affecting nonunion employees before it presented the proposal to the union, which was bargaining for inclusion in the benefit plan. See KEZI, Inc., 300 N.L.R.B. 594, 600-01 (1990). These cases offer strong support for the proposition that employers may freely inform employees of bargaining proposals, and certainly may do so if the proposals are already before the union.

11

The Board presents only one case to support its restrictive position. In Detroit Edison Co., the Board concluded that the employer engaged in direct dealing because it presented the employees with the substance of a proposal before it presented the proposal to the union, and over union objections. Detroit Edison Co., 310 N.L.R.B. 564, 564-65 (1993). Rather than an example of an occasion when an employer submitted a proposal to the union and immediately distributed it to employees, the Board in that case specifically found that the proposal was distributed to the employees before fully presenting it to the union. See id. We thus find no support in this decision or the Act itself for the Board's contention that the union must have a meaningful opportunity to consider a proposal before an employer disseminates information to employees. This is not a reasonable interpretation of the Act. Furthermore, it is well settled that this Court will not accept the Board's departure from its standing interpretation of the Act without a reasonable explanation. See Westvaco, 795 F.2d at 1178; J.P. Stevens & Co. v. NLRB, 623 F.2d 322, 329 (4th Cir. 1980).

To impose this requirement upon employers would run counter to the language of § 8(c), and is not required to protect the interests of union members in organizing or bargaining collectively. Employers must be free to communicate their positions. See 29 U.S.C.A. § 158(c) (1998). Further, the publication of the exact offer that is properly before the union for consideration in no way erodes a union's position as the bargaining representative. There is no hint of a separate quid pro quo arrangement between the employer and employees in such circumstances and there is no danger of coercion. Instead, such notification tends to support the free exchange of information that aids employees in making informed decisions and promotes a stable bargaining environment. See Pratt & Whitney, 789 F.2d at 134; United Techs., 274 N.L.R.B. at 610. Not only did the Board change its interpretation of the Act in midstream, its holding is unreasonable because it is contrary to the language of the Act itself.

Because we find that the Board misinterpreted the mandate of § 8(a)(1) and (a)(5) and failed to give effect to § 8(c), we determine that Pine Lodge did not commit an unfair labor practice. Pine Lodge posted the letters only after it transmitted the letters to the Union and in exactly the same form. Moreover, Pine Lodge clearly addressed the

12

letters to the Union and requested a response from the Union.**3** There was no reference in the letters that could be construed as an invitation for direct bargaining. In summary, the letters were free of coercion, thus complying with § 8(c), and communicated only proposals that were properly before the Union, thus complying with § 8(a)(1) and (a)(5). Accordingly, we find no unfair labor practice under the Act.

B.

The Board also found that direct dealing took place during the course of the two conversations that Supervisor Dreama Thomas had with certain Pine Lodge employees. Characterizing these conversations as attempts to solicit employee input about the outstanding wage proposal, the Board concluded that the discussions were an effort to understand and directly respond to employee concerns, and thus to engage in the quid pro quo that characterizes direct dealing and undermines the Union's position as the exclusive bargainer.

Engaging in a course of implied bargaining would constitute direct dealing, and thus, an unfair labor practice. Therefore, if Pine Lodge sought feedback from employees in order to craft a stronger proposal to enhance the likelihood of obtaining a contract extension, rather than directing its inquiries to the Union, then its conduct would run afoul of the NLRA. The question we face is whether Pine Lodge merely communicated what was already before the Union in a proper exercise of its free speech rights or instead sought to strike a deal outside of the auspices of collective bargaining.

The Board's conclusion that Pine Lodge engaged in direct dealing involved mixed findings of law and fact, and therefore must be upheld if it is supported by substantial evidence viewing the record as a whole. See Pirelli, 141 F.3d at 514. Based on our review of the record, the Board's conclusion is not adequately supported.

_____

**3** We note that the Union representative was on vacation and evidently there was no substitute representative available when the July 5 offer letter was transmitted to the Union offices. That, however, has no bearing on Pine Lodge's obligations. It communicated the offer in good faith, and the Union was free to take any action it deemed appropriate upon receiving the correspondence.

13

1.

In the first instance of alleged direct dealing, Dreama Thomas held a meeting in her office with four of her employees, and eventually another management employee, Jackie Clark. The origins of the meeting are disputed. It is not disputed, however, that an employee, and not management, raised the question about the status of anniversary wage increases under the July 5 proposal.

An employer who simply answers an employee's question about an outstanding proposal cannot be considered to be involved in negotiations for purposes of the Act. If so, then an employer would be required to stand by mute -- not a practically desirable result and certainly not in keeping with § 8(c). See 29 U.S.C.A. § 158(c) (West 1998). The key, therefore, to whether this conversation was an allowable exercise of Pine Lodge's right to inform its employees of the terms of the outstanding proposal or an attempt by Pine Lodge to negotiate directly with employees, is Pine Lodge's conduct during the conversation and the substance of the discussion. Specifically, we must determine whether Pine Lodge embarked on a course of quid pro quo dealing, instead of merely clarifying the proposal already before the Union.

Pine Lodge did not initiate the discussion of the issue. The evidence is uncontroverted that an employee, Brenda Elliott, first asked Ms. Thomas about the anniversary wages. Both Dreama Thomas and Deborah Burgess testified to that effect.4  It is also evident, as found by the ALJ, that Thomas invited other employees, at least to hear the answer to Elliott's question, and requested Jackie Clark to join the discussion because Thomas believed that Clark was better able to explain the status of the anniversary increases.

The ALJ also found that Thomas solicited Elliott's question in an attempt to frame a better bargaining proposal. That finding, however, is clearly contrary to any testimony on the record. According to Thomas's testimony, Elliott asked about anniversary wage increases

_____

**4** The ALJ's opinion does not address whether Thomas asked others into her office following Elliott's question or whether Thomas simply decided to hold an impromptu meeting.

14

prior to the meeting, and Thomas called the meeting so the employees could hear the answer. Furthermore, Deborah Burgess, the witness whose account the ALJ credited, did not testify about anything that occurred prior to the meeting. Thus, we are left with the uncontradicted testimony of Thomas. Viewing the record as a whole, we must conclude that the ALJ's factual finding is incorrect. Elliott first raised the question to Thomas.

After Elliott asked her question about anniversary wage increases, Thomas called employees into her office.**5** Elliott repeated her question. No other employee inquired about the proposal. Clark then joined the group and gave an inconclusive answer, which ended the conversation. Significantly, neither Thomas nor Clark asked employees about their general interests in wages or benefits or even their concerns. It was simply an attempt to clarify the proposal that was already before the Union. There was no indication from these episodes that Pine Lodge was attempting to formulate a new proposal, and there is no evidence that a management employee implied that any concerns raised would be addressed by Pine Lodge. Clark was unable even to answer Elliott's question, although under § 8(c), it would have been perfectly appropriate to do so.

Based on the record as a whole, the Board's decision is not supported by substantial evidence. The conversation about the anniversary wage increases, initiated by an employee, was devoid of any evidence of bargaining, express or implied. Thus, we hold that it was not direct dealing and did not constitute an unfair labor practice under the Act.

_____

**5** The dissent makes much of the fact that Thomas called the meeting at which Elliott repeated her question. As we explain, however, the proper inquiry does not focus on the fact that a meeting was called, but the substance of the discussion at the meeting and the conduct of the supervisory employees during the meeting.

Furthermore, the dissent asserts that "perhaps . . . the only reasonable" characterization of the meeting is that it was an attempt by Pine Lodge to elicit feedback about the proposal. Post at 27. If so, the supervisory personnel roundly failed in their endeavor because they neither asked the assembled employees about their general concerns or about wages or benefits, nor learned anything more about employee views of the proposal.

15

2.

In the second conversation, which the ALJ characterized as improper direct dealing, Dreama Thomas had a brief conversation with employee Dorothy Smith while on a smoking break in Smith's car. Thomas asked Smith what she thought of the proposal. Dorothy Smith responded that the proposal sounded good, but that it was made only to get rid of the Union. That was the entirety of the conversation.

In the context of campaigns for the votes of union members, courts have held that friend-to-friend conversations outside of the workplace do not rise to the level of direct dealing. See Weather Shield Mfg., Inc. v. NLRB, 890 F.2d 52, 59-60 (7th Cir. 1989); Dow Chem. Co. v. NLRB, 660 F.2d 637, 649-50 (5th Cir. 1981). Although this statement was not made in the context of a campaign, this type of casual conversation still does not constitute evidence of direct dealing in the collective bargaining context.

Here again, there was no evidence of an attempt to enter into any quid pro quo negotiation with employees outside of the proposal on the table before the Union. Thomas asked a single question and did not pursue the matter any further. She did not question Smith about how the offer could be improved. Nor did Thomas communicate, either expressly or impliedly, that through dealing with Thomas or Pine Lodge, the employees could achieve the same or better results than they could achieve through the Union. No reasonable person could conclude that this brief exchange eroded the Union's position as the exclusive bargaining representative. We fail to see how a single question, posed in a nonwork setting, concerning what was undoubtedly the issue of the day, constituted evidence of direct dealing. Accordingly, there is insufficient evidence to support the Board's finding of an unfair labor practice under the Act.

C.

The Board and the ALJ also determined that the written communications from Pine Lodge to its employees on July 28 constituted direct dealing. According to the Board's ultimate conclusions, these communications both evidenced give and take between the employees and Pine Lodge and encouraged employees to abandon the Union.

16

Further, the Board concluded that Sherry Johnson's statement that Pine Lodge was making the offer in response to employee questions and her exhortation to give the offer serious consideration were improper direct dealings. We agree with the Board's conclusion that the memorandum from Johnson could be construed as direct dealing but for somewhat different reasons. We do not agree, however, that the language of the July 28 offer letter from Steve Ronilo, which was copied to the employees, was improper.

1.

The ALJ concluded that the July 28 offer letter, which stated that the proposal was "much more than we will be offering if we have to bargain in December 1995," constituted direct dealing because it invited abandonment of the union, presumably in favor of direct negotiation. This conclusion is unsupportable. Ronilo's statement was neither a promise of benefit nor threat of detriment and was thus protected under § 8(c). The offer was placed before the Union, and the Union had the right to accept or reject the proposal.[6] If rejected, the status quo simply would continue until the contract expiration. The language of the letter would certainly encourage the Union to consider the offer seriously, but we fail to see how it would encourage employees to abandon the Union in favor of direct negotiations. We find no substantial evidence of a violation in this statement.

Because the July 28 offer letter included language specifically addressing the anniversary wage increase, the ALJ also found evidence of give and take. We also take issue with this finding. Because the offer merely extended the 1993 agreement, which already

_____

[6] Unlike the dissent's characterization of our inquiry generally, and particularly in this Part and in Part III.D., we do not simply determine whether Pine Lodge made threats or quid pro quo promises. Instead, we first review the questioned communications for direct dealing, or quid pro quo negotiations, between the employer and employees. Second, our analysis recognizes that if the speech is not coercive, i.e., there is no threat of force or promise of benefit, then it is subject to the protections of § 8(c). Our analysis acknowledges both requirements and gives full effect to both the direct dealing doctrine of § 8(a) and the free speech protections of § 8(c).

included anniversary increases, it stretches logic too far to conclude that the specific mention of those increases in the July 28 offer letter represents evidence of give and take.**7** Both proposals only contemplated extending the term of the agreement for one year and increasing hourly pay rates. The mention of the anniversary pay increases in the July 28 offer letter simply clarified any misunderstanding, which Pine Lodge knew was a possibility due to the questions raised by employees regarding the July 5 offer.

2.

The ALJ also determined that Sherry Johnson's July 28 memorandum evinced direct bargaining. Unlike the other communications, Johnson's July 28 memorandum strayed beyond the protections of § 8(c) because it did more than explain the offer. Instead, it implied that the Union's unresponsiveness could be cured by direct negotiations. Johnson stated, "many employees [have] come to me asking if the wage increase that was offered earlier could be extended or reoffered since the union did not respond to the previous offer." (J.A. at 306.) She continued, "I am pleased to announce that the company has agreed to reoffer the proposal." (J.A. at 306.) Johnson also clarified that the anniversary wage increases were being offered. The memorandum implied that quid pro quo dealing would work and thus tended to erode the Union's position as the bargaining agent. Further, the memorandum undermined the Union's authority as the bargaining representative because it attempted to encourage employees to come directly to Pine Lodge if they were unhappy with the Union.

It is worth noting that the Johnson's July 28 memorandum did state that any response to the proposal would have to be made by the Union, which tended to mitigate the offending language. Thus,

_____

**7** The dissent simply misinterprets the July 28 offer letter. In its analysis, the dissent implies that July 28 offer letter proposed something more than the anniversary wage increases provided in the contract then in effect. The language of the offer letter, however, is clear: "All employees who would <u>normally receive</u> anniversary date increases between August 1, 1995 and December 31, 1995 will receive their tenure step increases on their respective anniversary dates, in addition to either the 25¢ increase or the 50¢ increase . . . ." (J.A. at 305 (emphasis added).)

18

whether Johnson's July 28 memorandum did in fact invite direct dealing is a close question. Despite our concern, we must defer to the Board because we find that substantial evidence supported its conclusion that this conduct violated § 8(a)(1) and (a)(5). See 29 U.S.C.A. § 158(a)(1) & (a)(5).

D.

Finally, the ALJ concluded that Pine Lodge engaged in several instances of direct dealing during the period between July 31, the date that the Union announced the vote, through August 4, the date of the vote. The ALJ specifically addressed two sets of events. The first involved a series of questions and brief conversations between individual supervisors and employees about the employee's attitude towards the offer.[8] The second was a round of flyers distributed to all employees encouraging them to vote for Pine Lodge's proposal. Whether these acts were indeed impermissible involves mixed questions of law and fact, and therefore, the Board's conclusion must be supported by substantial evidence. See Pirelli, 141 F.3d at 514.

During a campaign for union organization, union decertification, or contract ratification, the object of the vote is already established and thus the opportunity for direct dealing is diminished -- the question is no longer what will be offered, but whether the offer will be accepted. Once a vote is announced, any union negotiations are, by definition, at least temporarily concluded. An employer must always ensure that its communications are free of coercion, but concern about quid pro quo dealmaking, which would circumvent the union, naturally decreases. Cf. Vons Grocery Co., 320 N.L.R.B. 53, 56 (1995) (explaining that polling employees after a vote has been announced does not indicate an improper investigation of support for bargaining proposals, but instead merely a preview of the vote). Therefore, an

_____

[8] We note that the ALJ stated that the solicitation of employee input generally continued between July 28 and August 4, but in his factual findings he noted that the conversations between Johnson or Cooper and individual employees occurred only between July 31 and August 4. We must conclude from these references that the specific conversations at issue occurred only during the more limited period of July 31 to August 4.

19

employer may question employees about their attitudes towards the offer, see Dow Chem., 660 F.2d at 650-52, may hold meetings to explain bargaining proposals, see United Techs., 274 N.L.R.B. at 610, and may generally express support for its position, even if those comments include criticisms of the union's position, see Pratt & Whitney, 789 F.2d at 135 (holding that an employer statement that the union was "thoughtless and irresponsible" and that it was on "a collision course" was neither coercive nor implied that employees should abandon the union). Any forecasts of consequences for rejecting the employer's position are permissible as long as the forecasts are backed with objective evidence and do not imply retaliation within the employer's control. See Gissel Packing, 395 U.S. at 618; Crown Cork & Seal Co. v. NLRB, 36 F.3d 1130, 1138 (D.C. Cir. 1994); Garry Mfg., 630 F.2d at 938-39; Monroe v. NLRB, 460 F.2d 121, 125 (4th Cir. 1972). Employers and unions must be allowed equal footing. Unions cannot be "free to use the rhetoric of Mark Antony while employers are limited to that of a Federal Reserve Board chairman." Crown Cork, 36 F.3d at 1140; see Monroe, 460 F.2d at 125 ("In the context of a hard-fought election campaign, we find little evidence that [an employer's statements that improved benefits would be possible absent a union] exceed the permissible bounds of campaign rhetoric or that it could be construed by employees as threatening the loss of economic benefits."). Viewed in accordance with these standards, we have little trouble determining that Pine Lodge conducted itself in a lawful manner during the campaign period.

First, the questions and brief discussions that Pine Lodge supervisors, Sherry Johnson and Nancy Cooper, alternately engaged in with four employees, Dorothy Smith, Alice Boggs, Cindy Aust, and Sandra Glass, did not constitute direct dealings. In each of these conversations, Johnson or Cooper asked the employees about their opinion of the wage offer and whether they would vote for it. Without offering any reasoning, the ALJ concluded that these conversations were attempts to determine whether Pine Lodge's handbills persuading members to vote for the offer were effective. But as we have stated, because the proposal was already on the table, employee input would not aid in formulating Pine Lodge's bargaining strategy. Furthermore, whether the statements were or were not aimed at gauging the effectiveness of the employer's campaign is immaterial. Employers may engage in one-on-one conversations during an election campaign as

20

long as those conversations are not coercive. See Dow Chem., 660 F.2d at 650-52. These conversations may include questions or general statements of opinion. See id. Only in cases where the employees feared reprisals have courts determined solicitations of opinion to be improper. See id. at 650 (holding "casual and moderate inquiries, even as to union preference, absent evidence indicating that the employee has reason to consider the inquiries a threat of reprisals, as not constituting an unfair labor practice" (citing NLRB v. McGahey, 233 F.2d 406 (5th Cir. 1956))).

The ALJ found no coercion in the inquiries, and our review of the record reveals none. We, therefore, find no substantial evidence to support the charge that Pine Lodge committed an unfair labor practice under the Act when its supervisors discussed the upcoming vote with individual employees.

Second, we find no unfair labor practice in the flyers that Pine Lodge distributed. The ALJ concluded that three flyers tended to encourage direct dealing with the Union because they pressured employees into direct negotiations by predicting a less favorable outcome through the Union. In particular, one of the flyers stated that Union negotiations might not produce favorable results for the employees while voting for the July 28 offer would produce a "generous raise that is truly deserved."**9**  The Board also found that the flyers

_____

**9** The full text of the flyer reads:

> What's Up?
>
> Americare Pine Lodge wants to increase your wages 25 to 50
>
> The Union does not want you to accept this generous offer
>
> What's Up? ??? ??
>
> Through Union negotiations your [sic] may or maynot [sic] receive a generous wage increase. The outcome is not known.
>
> Through Americare Pine Lodge you will receive a generous raise that is truly deserved. This is known!
>
> The Union wants to take you out on a statewide strike this Christmas.
>
> Americare Pine Lodge wants to reward its hardworking employees

21

were improper because they "sought to disparage the Union and to drive a wedge between the Union and the unit employees" by asserting that the Union was planning a big strike. (J.A. at 2.)

At the time the flyer was distributed, there was no ongoing bargaining and both sides were actively seeking support for their respective positions. This situation is precisely the type in which concerns about direct dealing are greatly diminished. Pine Lodge's prediction of uncertainty if Union negotiations were undertaken in December is nothing more than encouragement to vote in its favor. The flyer did not fall outside of the protections of § 8(c) because Pine Lodge made no express or implied threat. See, e.g., TRW-United v. NLRB, 637 F.2d 410, 420-21 (5th Cir. 1981) (noting that threats consist of statements implying that existing benefits are in jeopardy). There was no promise of benefit, other than, of course, the wage increases that the Union already had agreed to put to a vote. The flyers simply presented no substantial evidence of direct dealing or coercion.

Nor, as the Board concluded, did the flyers improperly drive a wedge between the Union and employees through predictions of a strike and thus encourage direct dealing. First, any union member realizes that a strike is always a possibility during labor negotiations. Second, the Union literature frequently touted strikes and civil disobedience as a legitimate tool to obtain bargaining objectives. Third, the Union President, Teresa Ball, admitted under examination that the Union was attempting to coordinate contract expiration dates at a number of different facilities in the same region to obtain more bargaining power. Because Pine Lodge had an objective basis upon which it could reasonably base predictions of a strike, its criticisms of the Union's motivations were examples of permissible propaganda and thus protected under § 8(c). See Be-Lo Stores v. NLRB, 126 F.3d 268, 285-86 (4th Cir. 1997); Garry Mfg., 630 F.2d at 938-39 (holding that predictions of strikes are not threats and are permissible if they

_____

> It's your choice ! ! ! ! ! ! !
>
> That's what's up ! ! ! ! ! ! ! ! ! ! ! ! ! ! !

(J.A. at 316.) This flyer was in response to an earlier Union flyer which is reproduced at footnote 2.

22

are based on objective facts and are outside the employer's control). We find no substantial evidence for the Board's conclusion that these statements violated the NLRA.

In sum, of all the alleged instances of direct dealings, we find support in the record for only one unfair labor practice under the Act: the distribution of the July 28 memorandum from Sherry Johnson to the employees. We therefore reverse the Board's findings of unfair labor practices except as to this single instance, and affirm that finding.

IV.

Our conclusion that the vast majority of the Board's findings of direct dealings lack sufficient support, calls into question the Board's decision that the employees' decertification petition was tainted.

During the term of a collective bargaining agreement, an employer must bargain with its employees' collective bargaining representative. See 29 U.S.C.A. § 158(a)(5) (West 1998); Auciello Iron Works v. NLRB, 116 S. Ct. 1754, 1758 (1996); Pirelli, 141 F.3d at 520. Even after a collective bargaining agreement expires, a union maintains a rebuttable presumption of majority status. See Auciello Iron Works, 116 S. Ct. at 1758; Pirelli, 141 F.3d at 520. "To rebut the presumption, an employer must show `either (1) the union did not in fact enjoy majority support, or (2) the employer had a "good-faith" doubt, founded on a sufficient objective basis, of the union's majority support.'" Pirelli, 141 F.3d at 520 (quoting NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 778 (1990)). "`A petition signed by at least half of the bargaining unit's members in which they indicate that they do not wish to be represented by the union ordinarily constitutes sufficient objective evidence to rebut the union's presumed majority status.'" Pirelli, 141 F.3d at 520 (quoting NLRB v. D & D Enters., 125 F.3d 200, 209 (4th Cir. 1997)).

But, if the Board can "show that the employees are disgruntled with union representation because the employer has committed unfair labor practices that have negatively impacted the union's efficacy, the petition may be considered tainted," and the petition cannot be relied upon to rebut the presumption of majority support. Pirelli, 141 F.3d at 520.

23

The Board has developed a four-factor test to determine whether a decertification petition is tainted by unfair labor practices, which this Court has adopted. <u>See, e.g.</u>, <u>Pirelli</u>, 141 F.3d at 520-21 (setting forth the test). Those factors are:

> "(1) the length of time between the unfair labor practice and the decertification petition; (2) the nature of the employer's illegal acts; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union."

<u>Pirelli</u>, 141 F.3d at 520-21 (quoting <u>D&D Enters.</u>, 125 F.3d at 209). These factors simply represent an attempt to determine whether the unfair labor practices caused the decertification effort.

Applying these factors to the facts at hand, we determine that the July 28 Johnson memorandum was sufficiently isolated so that it would not taint the decertification petition. The petition was submitted approximately one month after the unfair labor practice occurred. However, the memorandum was but one communication in a sea of words between the Union, Pine Lodge, and the employees. Perhaps a communication that directly invited negotiations between the employer and employee could sufficiently impact the employees as to taint a decertification petition, but the somewhat vague implication contained in the July 28 Johnson memorandum does not rise to that level. In fact, it recognized that the "union must respond" to Pine Lodge's offer, thus affirming the authority of the Union. Although the language of the July 28 Johnson memorandum may cross the direct dealing line, there is little concern that it alone would breed disaffection with the Union. Finally, the memorandum is devoid of any threats or other language that would adversely impact employee morale or prompt employees to flee the Union. Viewed under these standards, we find that the memorandum's relationship to the decertification petition is too tenuous to support a finding that the petition was tainted.

Pine Lodge offers a litany of independent reasons for the employees' apparent dissatisfaction with the Union. In light of our finding that there was an insufficient causal link between the single episode

24

of direct dealing and the decertification petition, we need not explore possibilities of intervening causes.

Because we conclude that the Board erred in determining that the decertification petition was insufficient to support a good-faith doubt that the Union represented a majority of employees, we reverse the Board's finding. Accordingly, we also find that the Board erred when it determined that Pine Lodge violated § 8(a)(1) and (a)(5) when it unilaterally implemented the proposed wage increases at the expiration of the 1993 agreement.

V.

Based on the above findings, we grant Pine Lodge's petition for review in part, and deny it in part, and we grant the Board's cross-petition for enforcement in part and deny it in part.

PETITION FOR REVIEW GRANTED IN PART
AND DENIED IN PART; CROSS-APPLICATION
FOR ENFORCEMENT GRANTED IN PART AND
DENIED IN PART

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

Although I concur in sections III(A), III(B)(2), and III(C)(2) of the majority's opinion, I find that there is substantial evidence to support the findings of the Administrative Law Judge (ALJ) and the National Labor Relations Board (NLRB or Board) that Americare Pine Lodge Nursing and Rehabilitation Center (Americare) directly dealt with its employees. I therefore respectfully dissent from the remainder of the majority's opinion.

I. Direct Dealing

Since most of the Board's findings at issue are either pure questions of fact or mixed questions of law and fact, we must respect the Board's findings as conclusive if supported by substantial evidence based upon the record as a whole. Universal Camera Corp. v.

N.L.R.B., 340 U.S. 474, 491 (1951); 29 U.S.C.A.§ 160(e) (West 1998); Pirelli Cable Corp. v. N.L.R.B., 141 F.3d 503, 514 (4th Cir. 1998). Substantial evidence "`must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.'" Universal Camera Corp., 340 U.S. at 477 (quoting N.L.R.B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939)). A court should direct a verdict only if the evidence is such that "a reasonable [person] could come to but one conclusion." Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Commission, 66 F.3d 669, 683 (4th Cir. 1995); 9A Charles A. Wright, et al., Federal Practice & Procedure: Civil § 2524, at 262 (2d. ed. 1995).

I disagree with the Court's ready dismissal of the Board's interpretation of many of the mixed questions of fact and law. I certainly do not find that the majority's counter-interpretations are the only conclusions a reasonable person could draw from the evidence.

The majority erred on several accounts. First, the majority erred at times by substituting its own reasonable interpretation of the facts for the Board's. In particular, in section III(B)(1) the majority erred by disregarding the Board's reasonable interpretation of the July 12 meeting. The majority asserts that it is not disputed that an employee, not management, raised the question about the status of anniversary wage increases at the July 12 meeting.[1] The Board, however, adopted the ALJ's finding that supervisor Thomas first asked the employees how they viewed the July 5 proposal. This was based on the direct examination of employee Burgess, during which she testified that the subject of the July 5 proposal first came up at the July 12 meeting when Thomas "asked us." While the record evidence on the sequence of events is not crystal clear, this testimony provides substantial evidence to support the Board's conclusion that Thomas solicited employee questions about, and was the first to raise, the July 5 proposal at the July 12 meeting.

_____

[1] The majority glossed over an important fact. As the Board pointed out, even if Elliott asked Thomas about the July 5 proposal prior to the July 12 meeting, the evidence is undisputed that Thomas unilaterally called the other employees together to discuss the proposal. Elliott had not requested such a meeting.

26

In fact, one could question the reasonableness of the majority's take on the facts. The majority asserts that employee Elliott first asked supervisor Thomas whether anniversary wage increases were included in the July 5 proposal while the two were alone. In response, Thomas called a meeting of several employees so that Elliott could repeat her question. Thomas did not know the answer to the question so she called her supervisor, Jackie Clark, to the meeting to see if Clark could answer it. Here is the problem with the majority's approach: What possibly could have motivated Thomas to call the other employees into a meeting so that Elliott could repeat a question, when Thomas, by her own admission, did not know the answer to Elliott's question in the first place? It is certainly a permissible inference (perhaps it is the only reasonable inference) that Thomas was trying to elicit feedback about the July 5 proposal from the other employees -- to see if they shared Elliott's concerns or had other suggestions about the proposal.**2**

Second, the majority obfuscated the correct legal standard. The issue in this case is whether Americare engaged in direct dealing in violation of §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1) & a(5) (West 1998). The majority focused heavily on section 8(c) of the NLRA, which immunizes the expression of any views, arguments or opinions if such expression "contains no threat of reprisal or force or promise of benefit." 29 U.S.C.A. § 158(c) (West 1998). In a vigilant effort to secure § 8(c)'s protections, the majority evaluated each communication at issue, in particular the written communications on July 28 (section III(C) of the opinion) and the personal contacts from July 31 through August 4

---

**2** The majority argues that, if it was Americare's goal to elicit feedback, they "roundly failed," ante at 15 n.5, because they neither asked about the proposal nor learned anything more about employee views. First, the majority incorrectly clings to its interpretation of the facts. As noted above, substantial evidence supports the ALJ's determination that Americare did ask the employees what they thought of the proposal at the July 12 meeting. Second, I hope that the majority does not mean to advocate a rule that direct dealing may only be found when an employer is successful or particularly adept in its efforts directly to deal with employees. The NLRA outlaws direct dealing whether it is undertaken by a bumbling or a skillful employer.

(section III(D) of the opinion), to see whether or not Americare had made threats or quid pro quo promises in these communications. Finding none, the majority held that no direct dealing took place.

Direct dealing may exist, however, even if no threat or promise is made by the employer. Direct dealing occurs, <u>inter alia</u>, when an employer attempts to bypass the Union in negotiations over the terms and conditions of employment. <u>See Medo Photo Supply Corp. v. N.L.R.B.</u>, 321 U.S. 678, 683-684 (1944); <u>N.L.R.B. v. Pratt & Whitney Air Craft Div.</u>, 789 F.2d 121, 134 (2nd Cir. 1986). The question turns on whether the employer's actions -- direct solicitation of employee sentiment, perceived give-and-take over working conditions, or disparagement of the union -- are likely to erode or undermine the union's position as exclusive bargaining agent of the employees. <u>See Alexander Linn Hosp. Ass'n</u>, 288 NLRB 103, 106 (1988), <u>enforced sub nom. N.L.R.B. v. Wallkill Valley General Hosp.</u>, 866 F.2d 632 (3rd Cir. 1989). In short, a court should examine "whether the employer has chosen `to deal with the Union through the employees, rather than with the employees through the Union.'" <u>Pratt & Whitney Air Craft Div.</u>, 789 F.2d at 134 (quoting <u>N.L.R.B. v. General Elec. Co.</u>, 418 F.2d 736, 759 (2nd Cir. 1969)). <u>Accord Facet Enters., Inc. v. N.L.R.B.</u>, 907 F.2d 963, 968 (10th Cir. 1990).

There are a series of cases (which I will call the "Survey cases") which illustrate the point very clearly, and which are relevant to the case <u>sub judice</u>. The Survey cases establish that an employer's effort to poll or survey employees about their opinions on issues subject to bargaining with the union constitutes unlawful direct dealing. Such direct solicitation of employee sentiment "plainly erodes the position of the designated representative." <u>Allied Signal, Inc.</u>, 307 N.L.R.B. 752, 754 (1992). It is the union's exclusive province to gather employee views, and the strength of those views, on matters subject to collective bargaining. <u>See id.</u>; <u>Obie Pacific, Inc.</u>, 196 N.L.R.B. 458 (1972); <u>Wallkill Valley General Hosp.</u>, 866 F.2d at 636; <u>Harris-Teeter Supermarkets, Inc.</u>, 293 N.L.R.B. 743, 744-45 (1989), <u>enforced</u>, 905 F.2d 1530 (4th Cir. 1990) (unpublished opinion). <u>But see Vons Grocery Co.</u>, 320 N.L.R.B. 53 (1995) (permissible to ask employees how they will vote in upcoming post-bargaining election).**3**

_____

**3** Citing to <u>Vons</u>, the majority argues that direct dealing concerns were at a minimum because once a vote has been scheduled, no further bar-

28

The majority's heavy reliance on cases, such as Dow Chemical Co. v. N.L.R.B., 660 F.2d 637 (5th Cir. 1981), N.L.R.B. v. Garry Manufacturing Co., 630 F.2d 934 (3rd Cir. 1980), and Crown Cork & Seal Co. v. N.L.R.B., 36 F.3d 1130 (D.C. Cir. 1994), involving union certification and decertification elections clouds the direct dealing standard. Cases involving union certification and de-certification elections are generally not helpful in the direct dealing context because in such cases, by definition, direct dealing is not an issue. In the context of a union certification election, the employees have not yet designated the union to be their exclusive bargaining agent, so the employer is not obligated by statute to negotiate exclusively with the union. Similarly, the entire purpose of a union decertification election is to circumvent the union, so direct dealing concerns are at a minimum. These cases, therefore, give a wide berth to employer communications and focus almost exclusively on whether the employer has used coercion or threats. See, e.g., N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 617 (1969); Louisburg Sportswear Co. v. N.L.R.B., 462 F.2d 380, 385 (4th Cir. 1972). In contrast, communications that do not contain threats or promises may constitute direct dealing because, as in the Survey cases discussed above, in the direct dealing context the employer's "communications are more than evidence of an unfair labor practice; they are the unfair labor practice itself." Safeway Trails, Inc. v. N.L.R.B., 641 F.2d 930, 933 (D.C. Cir. 1979) (finding employer had committed unfair labor practice by attempting to undermine and subvert the authority of the employees' chief bargaining representative). The fact that the majority did not find direct dealing

_____

gaining is possible. Regardless of the validity of Vons, the majority's argument is not persuasive given the facts of the case sub judice. The ALJ and the Board specifically found that Americare had modified its July 5 proposal based on its solicitation of employee opinion. In this context, it was not unreasonable for the ALJ and the Board to conclude that Americare's continued solicitation of employee input was for the purpose of gauging employee opinions about, and incorporating such opinions into, its proposal. The vote at issue was not the end-game: Since Americare's proposals came outside the normal bargaining time-period, any "intelligence" on employee sentiment gained could be used to formulate later negotiating strategies, undermining the Union's role as bargaining agent.

29

is therefore not surprising, since it was often looking for the wrong behavior.

The majority's most severe error is that it examined each incident in isolation, using its sterile scalpel to sever each communication from the others and render its diagnosis: communication six was malignant, but communications one through five, seven, and eight, were benign. In fact, however, we are not concerned with a series of isolated lumps, but a single tumor -- an inter-related course of conduct carried out by Americare over a short period of time. And it was reasonable for the Board to conclude that the conduct was infected throughout. See Pratt & Whitney Air Craft Div., 789 F.2d at 135 (even if the communications do not individually constitute unlawful direct dealing, "the challenged communications can be viewed within a pattern of other unfair labor practices which, when examined in its totality, reveal direct dealing ....").

The majority neglected to examine the record in its totality. For instance, in section III(B)(1), the majority stated about the July 12 meeting called by Dreama Thomas, "[t]here was no indication ... that Pine Lodge was attempting to formulate a new proposal, and there is no evidence that a management employee implied that any concerns raised would be addressed by Pine Lodge." Ante, at 15. When viewed in isolation, the majority might be correct; but the record supports the contrary conclusion when the entire course of Americare's conduct is examined. The majority found that Sherry Johnson's July 28 memorandum constituted unlawful direct dealing because it implied that quid pro quo dealing was possible. One of the sections of that same memorandum stated, "please note for the employees who were concerned about not getting an anniversary wage increase, this is being offered also." Here was a clear signal to employees that any concerns raised would be addressed by Americare when formulating a new proposal. It is noteworthy that the concerns mentioned in the memorandum are exactly those concerns solicited from employees at the July 12 meeting.**4**

_____

**4** The majority rejected the ALJ's finding that the inclusion of anniversary increases in the July 28 offer letter provided evidence of give-and-take. The majority believes that the July 28 offer letter merely clarified

30

Similarly, when one connects the dots between the July 28 offer letter, the various solicitations of employee sentiment between July 31 and August 4, and Americare's flyers and memoranda, a picture emerges which substantially supports the Board's direct dealing diagnosis. Americare's first offer to the Union was rejected. While the offer was outstanding, management personnel solicited employee concerns about the offer. Americare shortly thereafter issued another offer. The letter announcing that offer began, "Enclosed please find an ... offer extended to the ... employees at Americare-Pine Lodge." The implication of this statement was emphasized by the fact that the offer was disseminated to each employee at the same time as it was sent to the Union.[5] The letter dared the Union to let the employees decide on their own whether or not to accept the offer, instead of having the Union, as their representative, make the decision. The July 28 offer was accompanied by a memorandum stating that the offer was extended because employees had come to management "after the Union did not respond to the previous offer." Further, the July 28 offer "also" included a provision on anniversary increases; the employees were told that this provision had been included "for the employees who were concerned about" the issue. Employees might remember that Americare knew of their concerns because it had solicited their opinions. After the offer was extended, management personnel continued to solicit employee input about the offer. Could this have been for the purpose of gauging the need to improve its offer yet again? Finally, various memoranda and fliers told the employees that

_____

the previous July 5 proposal. Yet Sherry Johnson, who put both wage proposals together, testified that she had not given any thought to how anniversary increases would be handled in the July 5 proposal and that she could not tell employees that the July 5 proposal included anniversary increases. Nor do the terms of the collective bargaining contract provide support for the majority's view. The contract did not set marginal increases in salary each year regardless of current pay; instead it associated a nominal salary with a given tenure. Under this system a "Level Two" employee with 5 years at Americare could conceivably have missed two years worth of anniversary wage increases under the July 5 proposal.

[5] While the simultaneous dissemination, in isolation, does not constitute direct dealing, see ante section III(A), we may still consider it in the context of a pattern of direct dealing.

31

"the Union wants to take you out on a statewide strike" and that they should "STAND UP to the Union" since Americare "DO[ES] NOT INTEND" to offer a similar wage increase if they have to bargain with the Union.**6** When the record is thus viewed in its totality, there is substantial evidence to support the Board's conclusion that Americare engaged in a course of conduct involving a give-and-take with employees, which was meant to circumvent the Union and otherwise undermine the Union's role as exclusive bargaining agent for the employees.

If the case had been before me as a matter of first impression I may not have come to the conclusions made by the ALJ and adopted by the Board. But our review is merely under a substantial evidence standard. This court should not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp., 340 U.S. at 488. I cannot agree that the Board was unreasonable in finding that Americare sought to deal with the Union through the employees rather than the employees through the Union. Pratt & Whitney Air Craft Div., 789 F.2d at 134. And that is all we are permitted to examine.

_____

**6** The majority concludes that Americare's assertion that the Union intended to strike and that Americare did not intend to offer a similar wage increase in the future are protected by § 8(c). I disagree. Employer predictions must be "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control ...." Gissel Packing, 395 U.S. at 618. There was no objective basis for the belief that the Union would force the employees to strike in December. First, as the record shows, a strike would require an employee vote. Second, to paraphrase the Supreme Court in Gissel Packing, Americare had no support for its basic assumption that the Union, which had not yet presented any demands, would have to strike to be heard. Gissel Packing, 395 U.S. at 619.

Separately, whether Americare decided to offer similar wage increases in Union negotiations in December is totally within Americare's control. A legitimate reading of the statement "we DO NOT INTEND to offer such a generous wage increase if we have to bargain in December" is that if employees do not accept the unilateral offer from Americare, Americare will not bargain in good faith during the scheduled negotiations with the Union.

II. Taint

Having found substantial evidence to support the Board's conclusions that Americare was engaged in a course of direct dealing, I would affirm the Board's determination that this course of direct dealing tainted the union decertification petition that soon followed under the test set forth in N.L.R.B. v. Williams Enterprises, Inc., 50 F.3d 1280, 1288 (4th Cir. 1995).

I would, therefore, affirm the Board's over-all decision, and enforce the Board's order.

33