# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Erie County Technical School,      :
         Petitioner      :
         :     No. 1818 C.D. 2016
         v.      :
         :     Argued: April 6, 2017
Pennsylvania Labor Relations      :
Board,      :
         Respondent      :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge


OPINION BY
JUDGE McCULLOUGH                      FILED: August 25, 2017


       Erie County Technical School (School) petitions for review of the October 18, 2016 final order of the Pennsylvania Labor Relations Board (PLRB) that dismissed the School's exceptions to the hearing examiner's decision and order, concluding that the school violated sections 1201(a)(1) and (5) of the Public Employe Relations Act (PERA)[1] by engaging in a coercive tactic and not bargaining in good faith.

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §1101.1201(a)(1), (5). Section 1201(a)(1) and (5) state:

> (a) Public employers, their agents or representatives are prohibited from:
>
> (1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

**(Footnote continued on next page…)**

The genesis of this case stems from the fact that, during a lengthy negotiation process with the exclusive representatives of the Erie County Technical School Federation of Teachers (Union), the School sent a letter – dubbed as a "memorandum" – directly to the Union's members. In this memorandum, the School simply recounted the "Final and Best Offer" it proposed to the Union and reiterated that at the last bargaining meeting, the School informed the Union that the offer, particularly a term regarding the retroactivity of wage increases, will remain on the table for a few days, after which point it may be withdrawn. On appeal, the School, alluding to the Free Speech Clause of the First Amendment, asserts that the memorandum is nothing more than an accurate depiction of what occurred at the last meeting and does not constitute an unfair labor practice. We agree and reverse the PLRB.

**Facts/Procedural History**

The facts are undisputed and the only issue in this case is whether the legal conclusions the PLRB derived from those facts were in error. In January 2014, the parties began negotiations for a successor collective bargaining agreement (CBA), but they were unproductive, and the CBA expired four months later in June. During the fall of 2014, the parties resumed negotiations and these meetings continued for

---

**(continued…)**

\* \* \*

> (5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

*Id.*

approximately one year without any agreement. (PLRB's Final Order and Decision at 1.)

On December 2, 2015, the parties had an unsuccessful negotiation session in which a mediator was present. On December 11, 2015, the School sent a letter to Union's members, which stated:

> On September 21st [2015], after nearly two years of negotiations, the [School's] Negotiating Committee presented a Final and Best Offer to the Negotiating Committee of the [Union]. We again met with the [Union's] team on December 2nd.
>
> We have enclosed for your review the [School's] Final and Best Offer. If you should have any questions about this offer, you should direct them to the [Union's] Negotiating Committee as they are your exclusive bargaining representatives. At the December 2nd meeting, the Committee advised the [Union's representatives] that if an agreement was not ratified by December 14th, there was no guarantee the wage increases proposed would be retroactive.

(*Id.*; Reproduced Record (R.R) at 70a.) As specified in the letter, the School attached a copy of its Final and Best Offer. (PLRB's Final Order and Decision at 1.)

On December 14, 2015, the Union filed a charge alleging, *inter alia*, that the Union committed unfair labor practices under sections (a)(1) and (5) of PERA. A hearing was held before a hearing examiner on March 10, 2016, at which both parties presented testimony and documentary evidence establishing the facts above. In concluding that the Union violated PERA, the hearing examiner provided the following rationale:

> The memorandum is directly addressed to the bargaining unit members rather than being information that is publicly released such as an update on a website or a statement made to the press. Thus, the obvious intent of the memorandum

3

is to directly communicate with the bargaining unit members in the context of ongoing negotiations. Further, the memorandum contains the statement "At the December 2nd meeting, the [School's] Committee advised the [Union's representatives] that if an agreement was not ratified by December 14th, there was no guarantee the wage increases proposed would be retroactive." This is a clear effort by the School to coerce the bargaining unit members by threatening to remove benefits from their "Final and Best Offer." This statement is a bald appeal by the School directly to the bargaining unit members and goes beyond a mere informational statement.

(PLRB's Final Order and Decision at 1, quoting Hearing Examiner's Decision at 3.)

Thereafter, the School filed exceptions, alleging that the hearing examiner erred in concluding that it violated sections 1201(a)(1) and (5) of PERA because the memorandum was an objective account of the status of negotiations. The School further alleged that the language regarding retroactivity was not coercive or threatening because it accurately portrayed what had occurred at the December 2, 2015 meeting with the Union and was merely a factual representation of the School's bargaining position.

The PLRB disagreed, concluding that the memorandum "was a direct communication to the bargaining unit members in an attempt to coerce employees, and contained a veiled threat of reprisals through the loss of retroactive pay increases." (PLRB's Final Order and Decision at 5.)

In making this determination, the PLRB first recounted that under the First Amendment, an employer is generally allowed to communicate with unionized employees during negotiations, even though the union's representatives are the exclusive bargaining agents for the union's members. However, the PLRB stated, the employer cannot make direct or indirect threats or communicate in a coercive manner and, also, cannot attempt to negotiate directly with the union members, instead of

4

their representatives, in an attempt to circumvent the collective bargaining process. The PLRB then found that the current facts rendered this case indistinguishable from its previous decision in Pennsylvania Labor Relations Board v. Portage Area School District, 7 PPER 325 (Nisi Decision and Order, 1976), where the PLRB concluded that a school district's superintendent violated PERA when he sent a letter to the union's members during negotiations for a successor agreement which said that the district would terminate all ongoing fringe benefits if the parties did not reach an agreement before the expiration of their contract. (PLRB's Final Order and Decision at 3.)

In likening this case to Portage Area School District, the PLRB concluded:

> Similarly, here, the School's memorandum was specifically addressed to all [the Union's] members and contained a statement that if an agreement was not reached by December 14, 2015, "there was no guarantee the wage increase proposed would be retroactive." Notably, the [Union's] members received the School's memorandum just three days before the School's self-imposed December 14, 2015, deadline. Clearly, the intent of the memorandum was to bypass the Union and coerce the [Union's] members into pressuring the Union to reach an agreement under threat of the loss of retroactive wage increases.

(Board's Final Order and Decision at 4.) In other words, the PLRB, while noting that "veiled threats are as unlawful as direct threats," held that "the statement [was] a threat to [the Union's] members that they [would] lose their retroactive pay if they do not ratify the School's proposal by December 14th." (*Id.* quoting Hearing Examiner's Decision at 3-4.)

5

Accordingly, the PLRB determined that the School violated sections 1201(a)(1) and (5) of PERA and ordered the School to cease and desist from refusing to bargain in good faith. The School then filed a petition for review in this Court.

**Discussion**

The School maintains that the memorandum reflects "an objective and factual recital of the School's position on retroactive pay, exactly as it was expressed to the [Union] at its December 2, 2015 meeting" and "cannot be considered coercive." (School's brief at 8.) Referencing the First Amendment, the School further argues that it "exercised its well-established right to inform its employees of the state of negotiations and proposal which were previously presented to the Union." *Id.* at 12. For these reasons, the School contends that the Board's legal conclusions with respect to coercive activity and bad faith are unsustainable as a matter of law.

Section 1201(a)(1) of PERA generally prohibits attempts by the employer to exercise coercion or control over the union and its members by forbidding employers from "[i]nterfering, restraining or coercing employes in the exercise of the rights guaranteed in" PERA. 43 P.S. §1101.1201(a)(1). A finding of a violation of section 1201(a)(1) naturally requires a finding of interference with or restraint or coercion of employees in the exercise of their rights guaranteed by section 401 of PERA, 43 P.S. §1101.401. That section of PERA is the "employe rights" provision and provides, in part, that "[i]t shall be lawful for public employes . . . to bargain collectively through representatives of their own free choice[.]" 43 P.S. §1101.401.

Pursuant to section 1201(a)(5) of PERA, an employer is obligated to bargain in good faith with the union's "exclusive representative." 43 PS.

6

§1101.1201(a)(5). Although it appears that the duty of good faith has not been defined or elaborated upon in much detail by the courts of this Commonwealth, the PLRB predicated the section 1201(a)(5) violation as being dependent upon the section 1201(a)(1) violation, concluding that where an employer deals directly with a union's members, and therefore violates the rights conferred under section 1201(a)(1) of PERA, the employer is not bargaining in good faith and also violates section 1201(a)(5). *See* PLRB's Final Order and Decision at 3 ("An employer's threats, coercion, and direct dealing with employes to circumvent the employe representatives are unfair labor practices under Sections 1201(a)(1) and (5) of PERA.") (citation omitted); *accord Allied Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 163 n.6 (1971).

Because both violations stem from, and are based entirely upon, the fact that the School sent the memorandum to the Union's members directly, the unfair labor charges under sections 1201(a)(1) and (a)(5) of PERA necessarily rise and fall together. The primary question presented, therefore, is whether the memorandum can be said to have interfered with the Union's members' right – or coerced or threatened them with respect to their right – to bargain collectively through the Union.

Both the PLRB and this Court have recognized that "the employer has a First Amendment right under the Constitution of the United States to communicate his general views to his employees." *Pennsylvania Labor Relations Board v. Stairways, Inc.*, 425 A.2d 1172, 1178 (Pa. Cmwlth. 1981); see American Federation of State, County, & Municipal Employees, Local Union No. 1971 v. Philadelphia Office of Housing and Community Development, 31 PPER ¶31055, 2000 PA PED LEXIS 13, at *14 (Final Order 2000) ("[A]n employer has a protected right to free speech."). In its opinions, the PLRB has stated:

7

> Ordinarily, rights of free speech remain operational during periods of negotiation between the parties . . . . The law is equally well established that an employer is not precluded from communicating, in noncoercive terms, with employes during negotiations, so long as such communications are not an attempt to negotiate directly with bargaining unit members.

Chester County Intermediate Unit No. 24 Education Association, PSEA-NEA v. Chester County Intermediate Unit No. 24, 35 PPER ¶110, 2004 PA PED LEXIS 24, at **3-4 (Final Order 2004).

In applying this standard, the PLRB and/or hearing examiners acting on behalf of the PLRB have created a set of parameters to gauge, in general, when an employer commits an unfair labor practice in commenting on the status of negotiations with a union's representatives.

For example, when a public employer placed a "Negotiations Timeline" on its website that provided a chronological summary of the negotiations that had occurred between bargaining representatives for the union and the employer, the PLRB found that no unfair labor practices were committed under sections 1201(a)(1) and (a)(5) of PERA. The PLRB reasoned that the employer acted lawfully because the timeline was not "an attempt to negotiate directly with individual bargaining unit members" and, although it included the employer's "impressions and opinions of the negotiating process," it did not contain any "specific factual misrepresentation or mischaracterization." Chester County Intermediate Unit No. 24, 2004 PA PED LEXIS 24 at **3-5. The PLRB further determined that "to the extent that the [u]nion regards the information in the 'Negotiations Timeline' to be inaccurate or requiring a response from the [u]nion, the [u]nion remains free to communicate its position as it deems appropriate." *Id.* at **6-7.

8

In another case, a public employer held a "meet and discuss" session with the union's representatives and two days later sent an email to the union's members, informing them of the meeting and listing and discussing five specific "problems," each dealing with the issue of employee scheduling. The email stated: "We will meet with your representatives again in about two weeks to get their input into solving these problems. I would like all of you to know what issues we have discussed with your union representatives. If you have ideas on how these issues might be resolved, please submit them to your union representatives within the next two weeks." Pennsylvania Social Service Union Local 668 Service Employees International Union v. Department of Public Welfare, Erie CAO, 41 PPER ¶35, 2010 PA PED LEXIS 53, at *2 (Proposed Decision and Order, 2010). One of the "problems" involved the employee's request for time off, and the email expressly advised the union's members that, despite the past practice of the parties, "[t]here is no local Leave Agreement and the leave request period could be changed to a different time." *Id.* at *4. The email then concluded: "I am sharing this information with you so that you are aware of the issues we are currently discussing with your labor representatives." *Id.*

The hearing examiner dismissed the unfair labor charges, explaining as follows:

> A close review of the record does not show that [the employer] engaged in direct dealing when she sent the email. Notably, the record shows that the parties held a meet and discuss session about the subject matter of the email (scheduling) two days before [the employer] sent the email, so it is apparent that she only sent the email after [the union's representatives] had a meaningful opportunity to consider any proposals about scheduling. Moreover, the record shows that her email was not coercively phrased.

9

> Furthermore, the record does not show that [the employer] misrepresented [the union's] position.

*Id.* at **12-13. In so holding, the hearing examiner in Social Service Union Local 668 noted that the union "cited a host of direct dealing cases as controlling authority," but found that "[a]ll of them were distinguished on the facts by [a] former hearing examiner." *Id.* at **14. Adopting the reasoning of that hearing examiner, the hearing examiner ultimately concluded that the cases relied upon by the union were "not on point because they either involved attempts to directly negotiate with employes or employer communications during contract negotiations which did not give an objective account of the status of those negotiations." *Id.* at **15.

> Conversely, in distilling prior precedent, the PLRB has concluded that,

> an employer engages in direct dealing and bypasses the exclusive bargaining representative when a bargainable matter is not first presented to the union representative in a bargaining atmosphere where the union negotiator has a meaningful opportunity to consider the proposed matter in the context of bargaining without external influences or reactions from employes, who may not be privy to the full panoply of issues relevant to the proposal or the negotiations in general.

Philadelphia Office of Housing and Community Development, 2000 PA PED LEXIS at *17. As a concrete illustration of this principle, in Philadelphia Federation of Teachers, Local # 3 v. Philadelphia School District, 25 PPER ¶25049 (Proposed Decision and Order 1994), a hearing examiner determined that an employer exceeds the limits of free speech in labor relations and engages in unlawful direct dealing with its employees when it presents its employees with a new, specific proposal at a staff meeting and the proposal concerned a matter that was the subject of negotiations between the employer and the union negotiators. The hearing examiner concluded that such direct dealing destabilizes the status of the union, as the exclusive

10

bargaining representative, and undermines the employees' confidence and trust in the union. *See* Philadelphia Office of Housing and Community Development, 2000 PA PED LEXIS at *15 (summarizing this decision).

In Portage Area School District, the school district's superintendent sent a letter to all bargaining unit members during negotiations for a successor agreement, which stated that the district would terminate existing fringe benefits, such as health insurance, if the parties did not reach an agreement before expiration of the parties' CBA. The PLRB concluded that the school district committed an unfair practice by sending the letter to the union's members stating, in relevant part, as follows:

> A *threat* made during the pendency of negotiations to unilaterally eliminate economic fringe benefits because a successor collective bargaining agreement has not been negotiated can only be viewed by the [PLRB] as a device to intimidate or coerce the [union] and its members to reach such an agreement. A threat so made is as disruptive to the collective bargaining practice as is an actual unilateral cessation of such benefits.

> \*     \*     \*

> Here, the threatening letter was specifically addressed to "Members of the Portage Area Education Association." Said letter specifically states that [the school district's] payment of certain economic fringe benefits would be discontinued "for all members of the Portage Area Education Association." When viewed in the context of negotiations, it appears, and we infer, that members of the [union] were singled out, since they were the ones who would vote to ratify any [CBA], and they were the ones who, because of their relation to the [union], could put pressure on the [union's representatives and members] to reach such an agreement. Nothing in the record tends to alter this inference.

> An attempt to interfere with the administration or existence of an employe organization may be direct or indirect.

11

> Where unlawful threats are made to members of the employe organization, which are found to be designed to place economic coercion on those members so as to force an agreement, such tends to weaken the position of the employe organization at the bargaining table, tends to interfere with the internal processes of the organization, and tends to weaken the collective bargaining process, itself.

(PLRB Final Order and Decision at 3-4, quoting Portage Area School District, 7 PPER at 236-237.)

Upon our review, the School's memorandum, on balance, appears to us to be more closely aligned with the correspondence in the PLRB cases that have found that the employer did not engage in an unfair labor practice. It is undisputed that the memorandum was factually accurate from an objective standpoint, informing the Union's members of what had happened at the prior meeting and directed them to take any issues that they may have had to their representatives. Unlike the situation in Philadelphia School District, the School did not bypass the Union's representatives and submit a new proposal to the Union's members. Instead, the School advised the Union's representatives that its "Final and Best Offer," specifically the term pertaining to retroactive wage increase, may not be on the table in the near future, and twelve days later, relayed this information to the Union's members. The Union's representatives also had more than two months to consider the Final and Best Offer before the School presented it to the Union's members and, consequently, the representatives had "a meaningful opportunity to consider the proposed matter in the context of bargaining without external influences or reactions from employes." Philadelphia Office of Housing and Community Development, 2000 PA PED LEXIS, at *17. In these circumstances, it is difficult to see how the School interfered with the right of the Union's members to bargain collectively through their representatives because the School first submitted the offer to the representatives, did not bypass or

12

otherwise undermine their authority to consider the proposal or negotiate the successor agreement, and told the Union's members to contact their representatives if they had any questions.

Moreover, although the PLRB found the memorandum to be "virtually identical" to the letter in <u>Portage Area School District</u>, (PLRB's Final Order and Decision at 3), there is a fundamental distinction between the two. In <u>Portage Area School District</u>, the school district told the union members that it **would** unilaterally eliminate their existing and ongoing right to fringe benefits while the parties negotiated a successor CBA. Here, by contrast, the School advised the Union's members that a favorable term of a proposed successor CBA **may or may not** be part of the successor agreement in the event the successor agreement is not ratified within a prescribed timeframe. While the former situation constitutes a threat by the employer to discontinue benefits that continue in force per the prior CBA – or disrupted the *status quo* – during the negotiation process and used this threat to urge coercive acceptance of a successor agreement, the latter scenario pertained to the status of the negotiations and related to the potential terms or conditions to be included in the successor agreement itself.[2]

---

[2] *See generally Pennsylvania Labor Relations Board v. Williamsport Area School District*, 406 A.2d 329 (Pa. 1979) (explaining that under sections 1201(a)(1) and (a)(5), the unlawful unilateral cessation of benefits occurs when the employer disrupts the *status quo* by failing to abide by the terms and conditions of an expired CBA during negotiations); *and compare with Fairview School District v. Unemployment Compensation Board of Review*, 454 A.2d 517 (Pa. 1982) (concluding that the school district did not violate the *status quo* by refusing to pay stepped-up salary increases after the collective bargaining agreement expired); *Neshaminy Federation of Teachers Local Union 1417 v. Pennsylvania Labor Relations Board*, 986 A.2d 908 (Pa. Cmwlth. 2009) (reinforcing the principle that wages and wage increases are mandatory subjects of bargaining and concluding that the school district did not violate the *status quo* or commit an unfair labor practice by refusing to pay increases that could have been deemed to have accrued during expiration period).

13

Put simply, the Union's members were not yet (and may never be) vested with the right to the proposed wage increase and retroactivity of that wage increase, and, for purposes of labor law, the School could not have unlawfully terminated or threatened to terminate a right that never existed in the first place. This is because "[a]bsent abuse not present here, it is perfectly legitimate for a party to retract a proposal before the other side has accepted it," *Soule Glass and Glazing Co. v. National Labor Relations Board*, 652 F.2d 1055, 1083 (1st Cir. 1981) (citation omitted), and "[t]he withdrawal of previous proposals or tentative agreements does not in and of itself establish the absence of good faith." *Mead Corp. v. National Labor Relations Board*, 697 F. 2d 1013, 1022 (11th Cir. 1983). Contrary to the PLRB's conclusion, the memorandum was not a veiled threat of reprisal "through the loss of retroactive pay increases." (PLRB's Final Order and Decision at 5.) Merely bargaining by refining, withdrawing, or countering a proposal cannot be deemed coercive because these are the basic tools of the negotiation process.

Our conclusion that the School did not run afoul of sections 1201(a)(1) and (a)(5) of PERA finds ample support in the decisions of the federal courts of appeals, which are seemingly unanimous in holding that an employer does not commit an unfair labor practice in circumstances that are materially indistinguishable from the facts of this case.[3, 4]

---

[3] These cases are brought under the National Labor Relations Act (NLRA), 29 U.S.C. §§151—168, and concern purported violations of sections 8(a)(1) and/or (a)(5), 29 U.S.C. §158(a)(1), (a)(5). *See, e.g., Americare Pine Lodge Nursing & Rehabilitation Center v. National Labor Relations Board*, 164 F.3d 867, 876-77 & 878-89 (4th Cir. 1999); *accord Overnite Transportation Co. v. National Labor Relations Board*, 280 F.3d 417, 432-33 (4th Cir. 2002) (en banc) ("In this case, [the employer] informed the Teamsters of its proposed productivity plan before informing the representative employees of the plan. The plan was sent to union representatives on December 11, 1995, by overnight mail. When [the employer] presented the plan to its representative employees on December 13, it was merely exercising its right to publicize its

**(Footnote continued on next page…)**

14

bargaining position. The record does not suggest that the proposal was coercive in any way. To the contrary, represented employees were told that [the employer] was negotiating over the increase with the union and that they should refer feedback and questions to their union representatives. Those negotiations were scheduled to begin around December 17, 1995 . . . . The Teamsters, however, rejected the offer."); *Facet Enterprises, Inc. v. National Labor Relations Board*, 907 F.2d 963, 968-69 (10th Cir. 1990) ("On December 2, 1983, [the employer] sent a letter to its striking Detroit employees enclosing a copy of the company's latest bargaining proposal and exhorting employees to return to work under the terms of that offer . . . . On December 13, 1983, [the employer] mailed a second letter to the striking Detroit employees responding to some of press releases issued by the Union . . . . Standing alone, the two letters [the employer] sent to its Detroit employees would be insufficient evidence to support a finding of direct dealing. Rather, the letters are legitimate attempts to communicate [the employer's] bargaining position and controvert public statements by the Union."); *see also Royal Typewriter Co. v. National Labor Relations Board*, 533 F.2d 1030, 1034 & 1038 (8th Cir. 1976) ("The Union contends that the Board erred in failing to find a separate Section 8(a)(1) violation in three speeches made on February 21, 1969, by [the employer's] attorney, to the . . . employees . . . . [F]rom our review of the text of the speeches − basically a report on what [the attorney] had told the Union during negotiations − we find the Board's decision to reject this contention to be supported by the record."); *cf. also Philip Carey Manufacturing Co. v. National Labor Relations Board*, 331 F.2d 720, 727 (6th Cir. 1964) ("The Company's superseniority proposal was first made in its letter of September 26 . . . . The Board noted that after that date there were no further meetings until the Company withdrew its superseniority proposal . . . . There can be no doubt that the Union opposed vigorously the superseniority proposal and that it immediately became a major obstacle in negotiations . . . . The letter of September 26 said simply that, unless agreement was reached, the Company would make superseniority *a part of its proposed contract.* This did not mean necessarily that the Company was putting superseniority into effect, in violation of §8(a)(3), and we find that this letter, in and of itself, [was not] in violation of §8(a)(5).") (emphasis in original).

[4] Because sections 1201(a)(1) and (a)(5) of PERA are modeled after sections 8(a)(1) and (a)(5) of the NLRA, this Court may rely upon federal case law interpreting those provisions as persuasive authority. *Office of Administration v. Pennsylvania Labor Relations Board*, 916 A.2d 541, 550 (Pa. 2007) ("[O]ur Court has not hesitated to consider, and to follow, federal interpretation of the NLRA due to the similarity between the federal labor law and our own laws dealing with labor relations."); *see also Pennsylvania Labor Relations Board v. Mars Area School District*, 389 A.2d 1073, 1076 (Pa. 1978); *accord In re Appeal of Cumberland Valley School District*, 394 A.2d 946, 950 (Pa. 1978).

In perhaps the most comprehensive compilation of case law and discussion on direct-dealing cases involving an employer's communications with employees, the United States Court of Appeals for the Fourth Circuit explained:

> The [National Labor Relations Board (NLRB)] and the courts unanimously have recognized that an employer violates §8(a)(1) and (a)(5) if it engages in direct dealing with employees and thereby interferes in the collective bargaining process and in the union's role as the exclusive bargaining representative. Improper direct dealing is characterized by actions that persuade employees to believe that they can achieve their objectives directly through the employer and thus erode the union's position as the exclusive bargaining representative. Another way to frame the question of direct dealing is whether the employer has chosen to deal with the Union through the employees, rather than with the employees through the Union . . . .

*Americare Pine Lodge Nursing & Rehabilitation Center v. National Labor Relations Board*, 164 F.3d 867, 875 (4th Cir. 1999) (citations omitted). The court then continued:

> Counterbalancing the prohibition against direct dealing is an employer's strong interest in preserving its right to free speech . . . .
>
> Drawing the line between an employer's freedom to speak and direct dealing produces a relatively straightforward standard of permissible conduct. **An employer may speak freely to its employees about a wide range of issues including the status of negotiations, outstanding offers, its position, the reasons for its position, and objectively supportable, reasonable beliefs concerning future events**. But, under §8(c) the employer cannot act in a coercive manner by making separate promises of benefits or threatening employees. **Thus the employer may freely communicate with employees in noncoercive terms, as long as those communications do not contain some sort of express or implied quid pro quo offer that is not before the union**. This standard recognizes the right of

16

> represented employees to negotiate exclusively through the union, while protecting the right of employers to tell their side of the story.

*Americare Pine Lodge*, 164 F.3d at 875 (citations omitted) (emphasis added). From these premises, the court deduced the general proposition that "[c]ommunications to employees that inform them of the employer's bargaining position constitute no violation" of the NLRA, because "employers may freely inform employees of bargaining proposals, and certainly may do so if the proposals are already before the union." *Americare Pine Lodge*, 164 F.3d at 876.

After providing the appropriate legal framework, the court in *Americare Pine Lodge* applied the precepts to the facts before it. In that case, near the expiration of a collective bargaining agreement, the employer sent a letter on July 5, 1995, offering a one-year contract extension in return for hourly wage increases to the business office of the union's representative. The employer also sent copies of the letters to the union's members, and shortly thereafter, posted the letter near the employees' time clock so that the employees could read it. The offer, by its own terms, was set to expire on July 17, 1995. However, the union's representative decided that the employees did not favor the offer and simply allowed the offer to expire.

On July 28, 1995, the employer in *Americare Pine Lodge* sent the union's representative another letter, which proposed an offer that contained the hourly wage increase in the prior offer and clarified that the anniversary wage increases in the former collective bargaining agreement would continue to be a term in the new proposed collective bargaining agreement. In addition, the letter said that the "proposal is much more than [the employer] will be offering if we have to bargain in December 1995." *Id.* at 872. This letter, too, was copied to the union's members and posted near the time clock, and the union's members were informed that the offer

would be withdrawn on August 4, 1995. Ultimately, the parties were unable to reach an agreement and labor charges ensued.

Relevant to the present case, the NLRB found that the employer engaged in unlawful direct dealing by posting the letters at the employees' work station and also by suggesting that the same offer would not be forthcoming if negotiations were conducted in December. In overruling the NLRB on the posting issue, the Fourth Circuit concluded:

> [T]he publication of the exact offer that is properly before the union for consideration in no way erodes a union's position as the bargaining representative. There is no hint of a separate quid pro quo arrangement between the employer and employees in such circumstances and there is no danger of coercion. Instead, such notification tends to support the free exchange of information that aids employees in making informed decisions and promotes a stable bargaining environment . . . .
>
> [The employer] posted the letters only after it transmitted the letters to the Union and in exactly the same form . . . . There was no reference in the letters that could be construed as an invitation for direct bargaining. In summary, the letters were free of coercion, thus complying with §8(c), and communicated only proposals that were properly before the Union, thus complying with §8(a)(1) and (a)(5). Accordingly, we find no unfair labor practice under the [NLRA].

*Americare Pine Lodge*, 164 F.3d at 876-77.

In reversing the NLRB on the second issue, the court determined:

> The [NLRB] concluded that the July 28 offer letter, which stated that the proposal was "much more than we will be offering if we have to bargain in December 1995," constituted direct dealing because it invited abandonment of the union, presumably in favor of direct negotiation. This conclusion is unsupportable. [The] statement was neither a promise of benefit nor threat of detriment and was thus

18

> protected under §8(c). The offer was placed before the Union, and the Union had the right to accept or reject the proposal. If rejected, the status quo simply would continue until the contract expiration. The language of the letter would certainly encourage the Union to consider the offer seriously, but we fail to see how it would encourage employees to abandon the Union in favor of direct negotiations. We find no substantial evidence of a violation in this statement.

*Americare Pine Lodge*, 164 F.3d at 879.

Here, the School's memorandum is just as innocuous (or even more so) than the letters in *Americare Pine Lodge*. Therefore, we conclude that the PLRB erred, as a matter of law, in determining that the School violated sections 1201(a)(1) and (5) of PERA. Accordingly, we reverse.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Erie County Technical School,          :
                      Petitioner          :
                                         :
                                       :   No.  1818 C.D. 2016
                  v.          :
                                         :
Pennsylvania Labor Relations          :
Board,          :
                    Respondent          :

## *ORDER*

        AND NOW, this 25th day of August, 2017, the October 18, 2016 final order of the Pennsylvania Labor Relations Board is hereby reversed.

                                       _____
                                       PATRICIA A. McCULLOUGH, Judge